2025 IL App (1st) 231683

First District
Third Division
September 3, 2025

No. 1-23-1683

| | | |
|---|---|---|
| | ) | |
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | No. 23 CR 1281 |
| v. | ) | |
| | ) | The Honorable |
| JAMON WADE, | ) | John F. Lyke, |
| | ) | Judge Presiding. |
| Defendant-Appellant. | ) | |
| | ) | |

JUSTICE REYES delivered the judgment of the court, with opinion.
Presiding Justice Martin and Justice Rochford concurred in the judgment and opinion.

**OPINION**

¶ 1        After a bench trial, defendant Jamon Wade was found guilty of being an armed habitual criminal (720 ILCS 5/24-1.7(a) (West 2022))[1] and unlawful possession of a weapon by a felon (*id.* § 24-1.1) and was sentenced to eight years in the Illinois Department of Corrections (IDOC). Defendant now appeals, contending that (1) the State failed to prove him guilty beyond a reasonable doubt, (2) the armed habitual criminal statute violates the second amendment of the United States Constitution (U.S. Const., amend. II) and article I, section 22, of the Illinois Constitution (Ill. Const. 1970, art. I, § 22), (3) his sentence was excessive and premised on improper sentencing factors, and (4) his conviction for unlawful possession of a

---

[1]We note that, effective January 1, 2025, this offense is now known as "[u]nlawful possession of a firearm by a repeat felony offender." Pub. Act 103-822, § 20 (eff. Jan. 1, 2025) (amending 720 ILCS 5/24-1.7). As defendant was convicted prior to the amendment's effective date, we refer to the offense by the name in effect at the time of his conviction.

weapon by a felon violates the one-act, one-crime rule. For the reasons set forth below, we affirm defendant's conviction and sentence for being an armed habitual criminal, but vacate the conviction for unlawful possession of a weapon by a felon and order the mittimus corrected.

¶ 2                                                    BACKGROUND

¶ 3        Defendant was a passenger in a vehicle that was stopped by police during the early morning hours of January 9, 2023. During the course of the traffic stop, defendant, who had been seated in the back seat on the driver's side of the vehicle, was arrested after officers discovered a loaded firearm on the floorboard behind the passenger's seat. Defendant was subsequently indicted on four counts, including one count of being an armed habitual criminal, one count of unlawful possession of a weapon by a felon, and two counts of aggravated unlawful use of a weapon (720 ILCS 5/24-1.6 (West 2022)).

¶ 4        The matter came before the trial court for a bench trial on June 22, 2023. The sole witness to testify was Chicago Police Department officer Maria Espinoza, who testified that, on January 9, 2023, at approximately 12:50 a.m., she was on routine patrol near the 4800 block of West Rice Street with her partner, Officer Brandon Almeda,[2] when she observed a vehicle traveling eastbound on Rice Street, a one-way street running westbound. Espinoza, who was in a marked police vehicle, activated the police vehicle's lights and sirens and performed a traffic stop.

¶ 5        When she exited the police vehicle, Espinoza approached the passenger's side of the stopped vehicle, while Almeda approached the driver's side. As she approached, Espinoza could observe three occupants inside the vehicle: a female driver; a female front seat passenger;

---

[2]While Espinoza did not testify to Almeda's first name, it appears elsewhere in the record on appeal.

and a male back seat passenger, who Espinoza identified in court as defendant. Espinoza spoke with the driver and the female passenger and testified that "[t]hey were compliant. They were engaging with us, talking with us, and they were showing me pictures of their kids." They also gave Espinoza consent, "multiple times," to search the vehicle, insisting that there was "nothing inside." Espinoza testified that defendant "wasn't talking much and *** he seemed very shaky with us."

¶ 6      Espinoza eventually asked defendant to lower the rear windows, and defendant lowered the rear passenger's side window, near where she was standing. When he did, Espinoza was able to observe a Glock semiautomatic firearm on the floorboard behind the passenger's seat; the firearm was not underneath the passenger's seat and was not covered by anything. When she observed the firearm, she requested backup and "tried making eye contact" with Almeda to let him know that there was a firearm inside the vehicle. She also used her flashlight to keep defendant's hands illuminated "to make sure he wasn't going to reach for it," as defendant would have been able to reach the firearm from where he was sitting. Espinoza testified that defendant was "[c]lose" to the firearm, as "[h]e was sitting in the middle of the backseat."

¶ 7      Espinoza testified that she waited for backup to arrive before ordering the occupants to exit the vehicle "for safety," as "there was three of them and two of us." Once backup arrived, she immediately ordered the occupants to exit the vehicle. Defendant exited the vehicle from the driver's side and walked toward the back of the vehicle. Espinoza instructed him to stand near the vehicle, but defendant began running away. Almeda and the other officers on the scene chased after defendant while Espinoza remained with the vehicle to ensure the firearm was recovered. When she recovered the firearm, she observed that it was loaded with live ammunition.

¶ 8     When Espinoza recovered the firearm, the driver was standing outside the vehicle, but the front passenger had not yet exited. Espinoza detained the driver "to make sure everyone was detained until we figured it all out," as well as for officer safety, as she was the only officer at the scene at the time, since the others were chasing defendant. As Espinoza was detaining the driver, the front passenger exited the vehicle. Espinoza gave verbal commands to the passenger to come to the back of the vehicle so that she could be detained along with the driver, but the passenger failed to follow the commands. After speaking with Espinoza for over a minute, the front passenger ran away.

¶ 9     Espinoza testified that she was wearing a body-worn camera during the traffic stop and that it accurately depicted what she observed during the stop. The video from the body-worn camera, which was admitted into evidence, was then played while Espinoza narrated what she observed. The video depicts the traffic stop in its entirety from Espinoza's vantage point and largely corroborates her testimony. The position of the camera on her torso, however, is located below the window line of the vehicle, meaning that the interior of the vehicle is not captured on the video until after the rear doors are opened later in the course of the traffic stop. As is relevant to the instant appeal, the video depicts a car seat on the passenger's side of the back seat, and the front passenger's seat is somewhat reclined. There also appears to be a duffel bag on the floor near the center of the back seat. Additionally, when Espinoza opens the rear passenger's side door to recover the firearm, light can be observed illuminating the floorboard. The parties also stipulated to the admission of the video from Almeda's body-worn camera, which showed the traffic stop from his vantage point.

¶ 10      Apart from Espinoza's testimony, as well as her and Almeda's body-worn camera videos, the only evidence presented at trial consisted of certified copies of defendant's two prior convictions for aggravated unlawful use of a weapon.

¶ 11      After considering the evidence and the parties' arguments, the trial court found defendant guilty of being an armed habitual criminal and of unlawful possession of a weapon by a felon, but not guilty of aggravated unlawful use of a weapon. The trial court noted that possession could be proven by establishing either actual or constructive possession and found that "[t]here's no doubt in this Court's mind that [defendant] knew that gun was there. There is no doubt in this Court's mind and the State has proven beyond a reasonable doubt that he was in constructive possession of that weapon." The trial court specifically found that Espinoza's testimony was credible and further found that "[t]hat gun was in arm's reach of this defendant."

¶ 12      Defendant filed a motion to reconsider, which was denied. In denying defendant's motion, the trial court expanded on the basis for its findings. Specifically, the trial court noted that the defense argued that the guilty finding was based solely on defendant's flight, but it indicated that "[t]his Court relied on the totality of the evidence, not just the circumstances but the evidence." The trial court pointed to Espinoza's testimony that defendant " 'wasn't talking much and he seemed very shaky with us.' " The trial court noted that "[n]ot only did the Court *** hear that testimony, the Court has eyes and I saw the video. He indeed was acting very shaky and nervous in this Court's humble opinion," and the trial court took that into consideration when finding knowledge. The trial court also dismissed defense counsel's suggestion that "more" was required than defendant's mere flight, "not only running but saying, oh, no, I'm not going to jail because there's a gun in the car." The trial court found that "[h]e didn't verbally say that but his actions did."

¶ 13    The trial court further explained its reasoning concerning defendant's access to the firearm:

"Further, was he in arm's reach of that gun? Absolutely. Did the officer have any difficulty seeing that gun or did the Court have any difficulty seeing that video when the gun was clearly in plain sight on the floorboard of that vehicle behind the front passenger seat? Yes, there was indeed a baby seat but it did not overlap whereas you couldn't actually see down and see that. Was this defendant in close proximity to that weapon? Absolutely. Was he in arm's reach of that weapon? Absolutely he was. Based on his height and his length of arms the Court can see that. He had no problem in this Court's estimation being in constructive possession of that gun."

The trial court then concluded:

"So in the totality of the evidence, him acting shaky in the car, him not following directions of the police once he's out of the car, hightailing it from the police when they're giving him multiple orders to stop, he doesn't. With all of that, based on the totality of the evidence, knowledge has been proven as well as constructive possession."

¶ 14    The matter then proceeded to sentencing. In relevant part, defendant's presentence investigative report (PSI) indicated that defendant had a number of misdemeanors, as well as three felony convictions. In addition to the two convictions for aggravated unlawful use of a weapon, which served as the predicate offenses for his armed habitual criminal charge, the PSI indicated that defendant had been convicted in 2018 of "Harass Witness/Fam Membr," for which he had been sentenced to 24 months of probation. Prior to hearing arguments in aggravation and mitigation, the trial court asked whether either side had any corrections to the PSI, and neither did.

¶ 15     In aggravation, the State pointed to defendant's prior criminal history; specifically, the State referenced his two convictions for aggravated unlawful use of a weapon and his conviction for harassing a witness and requested "substantial jail time." In mitigation, defense counsel noted that defendant had a "good family and a very supportive relationship with his entire family" and had been working on obtaining his GED prior to his arrest. He was also active in his church and had significant ties to the community. Counsel also noted that being an armed habitual criminal was "not a violent crime in itself" and, accordingly, asked for the minimum sentence allowed by law. While defendant indicated that he declined to make a statement in allocution, he nevertheless addressed the court, proclaiming his innocence and stating that he was going to "move forward" and "get my life back together."

¶ 16     In sentencing defendant, the trial court indicated that it was taking into consideration the evidence at trial; the gravity of the offense; the PSI; the financial impact of incarceration; all "evidence, information, testimony, aggravation, mitigation"; and any substance abuse issues. The trial court further stated that it was taking into consideration defendant's statement, which "hopefully if he truly means it, he will get out and become a successful and productive citizen of society," as well as his age (25) and attendant characteristics.

¶ 17     The trial court found that, in aggravation, defendant "basically started a life of crime at an early age," being convicted of harassing a witness when he was 19 or 20 years old. The trial court characterized this as "his first foray into the felony realm." The trial court noted that, while on probation for that conviction, he was convicted of retail theft, followed by another conviction for retail theft only a month later. Two months after that, he was convicted of reckless conduct and then, another two months later, criminal trespass to state land. Finally, four months after that, defendant was convicted of criminal trespass to land. The trial court

noted that, "mind you, he's still on felony probation and he could have been sentenced by that judge to the penitentiary on either [*sic*] one of those violations. But luckily for him he did not." The trial court further noted that, "even while on that felony probation, May 1st, 2020, he picked up a gun case, his first gun case." As defendant was sentenced to a year in the IDOC on that charge, by the same judge who had sentenced him in the harassment case, the trial court "assume[d] that the probation was terminated unsatisfactorily." After being released, less than a year later, "he picks up another gun case," for which he was sentenced to a year in the IDOC. Less than a year later, he was convicted of retail theft and, later that same year, was convicted of battery, retail theft, and criminal damage to property.

¶ 18    The trial court observed:

> "He said he changed his behavior, from what I heard. He said five/six years [ago] he wasn't the same person at all. It wasn't five or six years that I named a lot of these convictions and the two felonies were not five or six years ago. They [were] less than three years ago. This is the defendant's third gun. June 25th, 2018, the law said you cannot possess a firearm or even ammunition ever again unless the governor pardons you. I haven't heard any evidence of a governor pardon."

The trial court noted that defendant had 10 convictions in the span of five years and warned that, "if you keep catching new offenses, that's what's going to happen, your sentencing is going to be longer and longer and longer."

¶ 19    The trial court ultimately sentenced defendant to eight years in the IDOC for the armed habitual criminal count and three years on the unlawful possession of a weapon by a felon count, with the sentences to merge. Defendant filed a motion to reconsider sentence, which was denied, and this appeal follows.

¶ 20                                        ANALYSIS

¶ 21         On appeal, defendant contends that (1) the State failed to prove him guilty beyond a reasonable doubt, (2) the armed habitual criminal statute violates the second amendment of the United States Constitution and article I, section 22, of the Illinois Constitution, (3) his sentence was excessive and based on improper sentencing factors, and (4) his conviction for unlawful possession of a weapon by a felon violates the one-act, one-crime rule. We consider each argument in turn.

¶ 22                                *Sufficiency of the Evidence*

¶ 23         Defendant first claims that the State failed to prove beyond a reasonable doubt that defendant possessed the firearm found in the vehicle. When reviewing the sufficiency of the evidence in a criminal case, we must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Smith*, 185 Ill. 2d 532, 541 (1999). "[A] reviewing court will not reverse a criminal conviction unless the evidence is so unreasonable, improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt." *People v. Rowell*, 229 Ill. 2d 82, 98 (2008). A reviewing court does not retry the defendant or substitute its judgment for that of the trier of fact with regard to the credibility of witnesses or the weight to be given to each witness' testimony. *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009); *People v. Ross*, 229 Ill. 2d 255, 272 (2008). Instead, "it is our duty to carefully examine the evidence while bearing in mind that the trier of fact is in the best position to judge the credibility of witnesses, and due consideration must be given to the fact that the fact finder saw and heard the witnesses." *People*

*v. Herman*, 407 Ill. App. 3d 688, 704 (2011) (citing *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004), and *Smith*, 185 Ill. 2d at 541).

¶ 24    In this case, defendant was found guilty of being an armed habitual criminal, which required the State to prove (1) that defendant possessed a firearm after (2) having been convicted of two or more qualifying offenses.[3] See 720 ILCS 5/24-1.7(a) (West 2022); *People v. Brooks*, 2023 IL App (1st) 200435, ¶ 38. On appeal, defendant does not dispute that he had been previously convicted of two qualifying offenses, but contends that the State failed to prove his possession of the firearm.

¶ 25    Possession may be either actual or constructive. *People v. Jones*, 2023 IL 127810, ¶ 30. As the firearm in the instant case was found near defendant, not on his person, the State was required to prove constructive possession. See *id.*; see also *People v. Wise*, 2021 IL 125392, ¶ 24 (equating possession " 'on' " the defendant's person with actual possession, and possession " 'about' " his person with constructive possession). "To establish constructive possession, the State must prove that the defendant knew contraband was present and that the defendant exercised immediate and exclusive control over the area where the contraband was found." *Jones*, 2023 IL 127810, ¶ 30. As knowledge is the "mental element" of the offense, it is often proven by circumstantial evidence rather than by direct proof. *Id.*; see *People v. Walker*, 2020 IL App (1st) 162305, ¶ 20 ("Constructive possession is almost always subject to proof by circumstantial evidence.").

---

[3]While defendant was also convicted of unlawful possession of a weapon by a felon, we agree with the parties that this conviction must be vacated on one-act, one-crime grounds, as discussed later in our decision. Consequently, we focus our analysis on considering whether the State sufficiently proved the elements of the armed habitual criminal charge.

¶ 26 Here, the firearm was recovered from the floorboard behind the passenger's seat, while defendant was sitting in the back seat on the driver's side of the vehicle. Defendant was not the owner or driver of the vehicle, and there was no testimony that fingerprints or other forensic evidence tied defendant to the firearm. Defendant thus contends that the State failed to establish either that he knew the firearm was there, or that he exercised immediate and exclusive control over the area where it was found.

¶ 27 "Knowledge may be shown by evidence of a defendant's acts, declarations, or conduct from which it can be inferred that he knew the contraband existed in the place where it was found." *People v. Spencer*, 2012 IL App (1st) 102094, ¶ 17. Factors from which knowledge may be inferred include (1) the visibility of the weapon from the defendant's position inside the vehicle, (2) the period of time in which the defendant had an opportunity to observe the weapon, (3) gestures by the defendant that indicate an effort to retrieve or hide the weapon, and (4) the size of the weapon. *People v. Bailey*, 333 Ill. App. 3d 888, 891-92 (2002) (citing *People v. Davis*, 50 Ill. App. 3d 163, 168 (1977)). A court should also consider "any other relevant circumstantial evidence of knowledge," including whether the defendant had a possessory or ownership interest in either the weapon or the vehicle in which the weapon was found. *Id.* at 892. A defendant's presence inside a vehicle, however, without more, is not sufficient to establish that he knows a weapon is present. *Id.* at 891.

¶ 28 In this case, defendant primarily challenges the applicability of the first factor, namely, the visibility of the weapon from the defendant's position inside the vehicle.[4] As an initial matter, defendant does not dispute that he was in close proximity to the firearm. Espinoza testified that defendant was "[c]lose" to the firearm and would have been able to reach it from where he was

_____

[4]We note that defendant recites the *Bailey* factors slightly differently from their common form.

sitting, and defendant does not challenge this testimony. Defendant, however, contends that proximity alone is not sufficient to establish knowledge. Our courts have found that proximity is relevant to the determination of whether a defendant constructively possessed a firearm. See, *e.g.*, *Wise*, 2021 IL 125392, ¶ 29; *People v. Cook*, 2021 IL App (3d) 190243, ¶ 25. Here, we similarly find that defendant's proximity to the firearm is a relevant factor that weighed in favor of a finding of knowledge, and defendant seemingly recognizes as much.

¶ 29     Despite his proximity to the firearm, defendant claims that he was unable to observe the firearm on the nearby floorboard, pointing to the fact that it was dark, both inside and outside the vehicle, and further maintaining that the environment inside the vehicle obscured his view of the firearm from his position in the back seat. Specifically, defendant notes that the front passenger's seat was reclined and there was a car seat on the passenger's side of the back seat, which he contends combined to "block[ ] almost all light from reaching the area of the car where the gun was." In addition, defendant points to the duffel bag on the floor between the seats, which he claims "only further obstructed" his view.

¶ 30     The evidence presented at trial, however, established that Espinoza was immediately able to observe the firearm from her position outside the passenger's side window, suggesting that the reclined seat and the presence of the car seat did not block the entirety of the view of the floorboard. We further note that, when Espinoza opened the door to recover the firearm, the vehicle's interior light was visible on the floorboard. Espinoza also testified that, when she observed the firearm, it was not under anything and was in plain view. Defendant contends that all that the evidence establishes is that the firearm was visible from *Espinoza's* position, not *his*. The visibility of the firearm from her perspective, however, is relevant to the analysis, especially with respect to defendant's arguments concerning the effect of the reclined seat and

the car seat. Indeed, the fact that Espinoza could easily observe the firearm from an angle that would arguably have been more impacted by these potential obstructions suggests that it would have been visible to defendant, who would have been able to view the floorboard area from a side angle and not from directly overhead.

¶ 31     Defendant also maintains that there was no evidence that he made any gestures toward the firearm. See *Bailey*, 333 Ill. App. 3d at 892 (one factor in inferring knowledge is whether the defendant makes gestures which indicate an effort to retrieve or hide the weapon). While there was no evidence that he made any gestures suggesting an intent to hide or retrieve the weapon, we nevertheless observe that the trial court found his demeanor during the traffic stop notable. First, the trial court found that defendant exhibited nervousness during the course of the traffic stop, as evidenced by both Espinoza's testimony and its independent viewing of the video from her body-worn camera. Nervousness, in combination with other factors, weighs in favor of a finding of knowledge. *People v. Ortiz*, 196 Ill. 2d 236, 266-67 (2001). Here, Espinoza testified that, while the front occupants of the vehicle were talkative and engaging with the officers, defendant "wasn't talking much and *** he seemed very shaky with us."

¶ 32     In addition, after exiting the vehicle, defendant failed to stand near the rear of the vehicle, as instructed, instead fleeing the scene, which the trial court found further weighed in favor of a finding of knowledge. A defendant's flight from the vehicle following a traffic stop has been found to support an inference of knowing possession. See *People v. Ingram*, 389 Ill. App. 3d 897, 901 (2009); see also *Spencer*, 2012 IL App (1st) 102094, ¶ 18 (flight from house supported inference that defendant had knowledge of the presence of a firearm and ammunition). Here, defendant's nervous demeanor and subsequent flight, coupled with his proximity to the firearm and its presence in plain view on the rear floorboard, amply support

13

the trial court's determination that defendant had knowledge of the presence of the firearm for purposes of the constructive possession analysis.

¶ 33    Knowledge, however, is not sufficient to establish constructive possession. See *Wise*, 2021 IL 125392, ¶ 28 ("a person's knowledge of the place or location of the [item] alleged to be possessed is not the equivalent of possession" (internal quotation marks omitted)). Instead, as noted, to establish constructive possession, the State must prove both (1) that the defendant knew the contraband was present and (2) that the defendant "exercised immediate and exclusive control over the area where the contraband was found." *Jones*, 2023 IL 127810, ¶ 30.

¶ 34    "Control is established when a person has the 'intent and capability to maintain control and dominion' over an item, even if he lacks personal present dominion over it." *Spencer*, 2012 IL App (1st) 102094, ¶ 17 (quoting *People v. Frieberg*, 147 Ill. 2d 326, 361 (1992)). While knowledge of the location of contraband is not equivalent to possession, a defendant's proximity to the weapon is a factor that courts have found relevant in determining whether the defendant constructively possessed a firearm. *Wise*, 2021 IL 125392, ¶ 29.

¶ 35    In this case, as noted, defendant does not dispute that he was "close" to the firearm based on his position within the vehicle. He instead contends that "[a]ll three people in the car had access to the gun," so the State failed to establish that he had exclusive control over the firearm. It is well settled, however, that "[t]he rule that possession must be exclusive does not mean*** that the possession may not be joint." *People v. Givens*, 237 Ill. 2d 311, 335 (2010); see *People v. Bogan*, 2017 IL App (3d) 150156, ¶ 31 n.3 (observing that "the term 'exclusive' tends to be misleading," as more than one person may share exclusive control over an object or area). Thus, the other occupants' access to the firearm does not prevent a finding that defendant also exercised immediate and exclusive control over the area. See, *e.g.*, *Ingram*, 389 Ill. App. 3d at

14

901 (the fact that the backseat passenger also had access to the firearm did not defeat a finding that the defendant, in the front passenger's seat, had constructive possession of the weapon); *People v. Hill*, 226 Ill. App. 3d 670, 673 (1992) (other resident's access to bedroom did not defeat a finding that the defendant had constructive possession of a firearm found in his bedroom).

¶ 36    In this case, defendant was within arm's reach of the firearm, and Espinoza testified that defendant would have been able to reach it from his position in the vehicle. Our supreme court has indicated that control for purposes of constructive possession requires that the defendant have immediate access to or timely control over the weapon. See *Wise*, 2021 IL 125392, ¶¶ 31, 34; *People v. Condon*, 148 Ill. 2d 96, 110 (1992). As it explained in *Condon*, "[a] felon with a weapon at his or her disposal is forced to make a spontaneous and often instantaneous decision to kill without time to reflect on the use of such deadly force. [Citation.] Without a weapon at hand, the felon is not faced with such a deadly decision." *Condon*, 148 Ill. 2d at 109-10. Thus, where the weapon at issue is located far from the defendant, "[t]he danger that the defendant would be forced to make an instantaneous decision to use the [weapon] was nonexistent because he had no 'immediate access to' or 'timely control over' the [weapon]." *Id.* at 110; see *Wise*, 2021 IL 125392, ¶ 34 (State did not establish control of firearm in vehicle where the firearm was 5 to 10 feet away from the defendant, the defendant could not reach it from his position, and there was no evidence that the defendant had touched the firearm); *Cook*, 2021 IL App (3d) 190243, ¶ 28 (where the defendant was seated in the rear passenger's seat and the weapon was on the floor in front of the rear driver's seat, "[d]efendant's position in the van gave him immediate access and timely control over the firearm, where defendant could have made an instantaneous decision to use the firearm").

15

¶ 37    Here, coupled with the evidence of defendant's knowledge of the firearm, a rational trier of fact could have determined that defendant had constructive possession of the firearm, based on his immediate access to the area in which the firearm was located. Accordingly, we affirm the trial court's finding that the State proved beyond a reasonable doubt that defendant was an armed habitual criminal.

¶ 38    We do not find persuasive defendant's attempts to analogize his actions to those of the other vehicle's occupants. First, defendant's suggestion that the firearm may have belonged to one of them is belied by the evidence in the record. As Espinoza testified—and as is clear from the video from her body-worn camera—the two other occupants repeatedly denied the presence of a weapon inside the vehicle and, indeed, affirmatively consented to a search of the vehicle multiple times. In fact, not only did they consent to a search, but they *volunteered* to allow the vehicle to be searched without being asked by Espinoza. This suggests that neither occupant was aware of the presence of any contraband inside the vehicle.

¶ 39    Additionally, while both defendant and the front passenger fled from the scene of the traffic stop, we agree with the State that the circumstances were entirely dissimilar. Defendant was seated in the back seat while Espinoza shined a flashlight into the vehicle specifically intended to keep his hands in view. Once backup arrived and Espinoza ordered the vehicle's occupants to exit, defendant immediately fled, despite her instructions to stand at the rear of the vehicle. By contrast, the front seat passenger remained seated for some time, while the driver exited the vehicle and was handcuffed by Espinoza. During this time, the video depicts both the driver and the front seat passenger growing increasingly agitated, repeatedly expressing confusion about what was occurring and asking Espinoza to explain why they were being detained. After receiving no response from Espinoza, who was in the process of forcibly handcuffing the driver

against her will, the front seat passenger ran away. Thus, a reasonable inference that could be drawn by a rational factfinder is that the reason for defendant's flight was what the police were going to find during the traffic stop, while the reason for the front seat passenger's flight was Espinoza's act of restraining the driver. While neither form of flight was acceptable, defendant's conduct could certainly have been found by the factfinder to be more suggestive of his culpability than the passenger's. Consequently, we reject defendant's suggestion that all three occupants were equally likely to have constructive possession of the firearm and affirm defendant's conviction.

¶ 40                                *Second Amendment*

¶ 41        Defendant next contends that his conviction should be reversed where both his armed habitual criminal conviction and his previous convictions for aggravated unlawful use of a weapon violate the United States and Illinois Constitutions. As an initial matter, we note that, during the pendency of briefing on the instant appeal, the Illinois Supreme Court issued a decision in *People v. Thompson*, 2025 IL 129965, upholding the constitutionality of the same subsection of the aggravated unlawful use of a weapon statute under which defendant was previously convicted. Decisions of the Illinois Supreme Court are binding on all lower courts (*People v. Artis*, 232 Ill. 2d 156, 164 (2009)) and, accordingly, we have no need to further consider defendant's arguments concerning the constitutionality of his predicate convictions. Consequently, we address only defendant's claim concerning the armed habitual criminal statute.

¶ 42        All statutes carry a strong presumption of constitutionality, and a statute will be found constitutional "if it can be reasonably done." *People v. Mosley*, 2015 IL 115872, ¶ 22. In order to overcome this presumption, "the party challenging the statute must clearly establish its

17

invalidity." *Id.* The question of whether a statute is constitutional is a question of law, which we review *de novo*. *Id.*

¶ 43    Defendant in this case raises both facial and as-applied constitutional challenges. A defendant raising a facial challenge to a statute "faces a particularly heavy burden." *People v. Bochenek*, 2021 IL 125889, ¶ 10. "A statute will be deemed facially unconstitutional only if there is no set of circumstances under which the statute would be valid." *Id.* Accordingly, the specific facts concerning the challenging party are "irrelevant" to the constitutional analysis. *Id.* By contrast, a party raising an as-applied challenge to a statute must demonstrate that the statute violates the constitution "as it applies to the facts and circumstances of the challenging party." *People v. Thompson*, 2015 IL 118151, ¶ 36. As this type of challenge is dependent on the particular circumstances of the individual defendant, "it is paramount that the record be sufficiently developed in terms of those facts and circumstances for purposes of appellate review." *Id.* ¶ 37. For this reason, a failure to raise an as-applied challenge before the trial court may result in the forfeiture of the issue on appeal due to the absence of such a record. See *People v. Harris*, 2018 IL 121932, ¶ 41; *People v. Johnson*, 2024 IL App (1st) 231155, ¶ 27.

¶ 44    In this case, defendant contends that the armed habitual criminal statute violates both the second amendment to the United States Constitution and article I, section 22, of the Illinois Constitution. Specifically, in his facial challenge, defendant argues that felons may not be constitutionally prevented from possessing firearms. In his as-applied challenge, he contends that, at a minimum, such a prohibition is unconstitutional when applied to those convicted of nonviolent felonies, such as him. The State claims that his as-applied challenge has been forfeited, as defendant did not raise it below and the record is not sufficiently developed as to

his allegedly nonviolent character.[5] We observe the certified copies of defendant's two prior convictions introduced at trial indicate that defendant was convicted of aggravated unlawful use of a weapon based on his lack of a firearm owner's identification card and concealed carry license. See 720 ILCS 5/24-1.6(a)(1), (a)(3)(A-5) (West 2022). At least one court has found that the nature of the predicate convictions provides a sufficient factual record to allow review of a defendant's as-applied constitutional challenge in similar circumstances. See *People v. Mobley*, 2023 IL App (1st) 221264, ¶ 20. We similarly choose to excuse any forfeiture in the instant case, as the nature of defendant's prior convictions is apparent from the record on appeal. We observe that a finding of constitutionality with respect to a defendant's as-applied challenge would necessarily defeat his facial challenge, as well, since there would be at least one set of facts in which the challenged statute is constitutionally valid. See *People v. Garvin*, 219 Ill. 2d 104, 125 (2006). Thus, if we find that the armed habitual criminal statute is constitutional as applied to those convicted of nonviolent felonies, defendant's facial challenge also fails.

¶ 45    The second amendment to the United States Constitution provides that, "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II. The United States Supreme Court has interpreted this language to "protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense." *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 8-9 (2022) (citing *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v.*

---

[5]Defendant also failed to raise his facial challenge before the trial court. It is well settled, however, that a facially unconstitutional statute is void *ab initio* and may be attacked at any time. See *Thompson*, 2015 IL 118151, ¶ 32.

*Chicago*, 561 U.S. 742 (2010)). It is clear, however, that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626.

¶ 46       In *Bruen*, the Supreme Court set forth a two-part test to apply in order to determine whether a statute violates the second amendment:

> "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' "
> *Bruen*, 597 U.S. at 17 (quoting *Konigsberg v. State Bar of California*, 366 U.S. 36, 49 n.10 (1961)).

Defendant argues that the armed habitual criminal statute does not satisfy the *Bruen* test and, therefore, his armed habitual criminal conviction must be reversed.

¶ 47       Defendant's constitutional challenge to the armed habitual criminal statute has been repeatedly considered and uniformly rejected by our courts since *Bruen* was decided. See *People v. Grace*, 2025 IL App (1st) 232429-U, ¶ 13 (collecting cases). In addition, a number of courts have considered the specific question of whether the armed habitual criminal statute is constitutional as applied to those convicted of nonviolent felonies and have concluded that it is. See, *e.g.*, *id.* ¶ 17; *People v. Johnson*, 2025 IL App (3d) 240185-U, ¶ 12; *People v. Hill*, 2025 IL App (1st) 231849-U, ¶ 20; *People v. Travis*, 2024 IL App (3d) 230113, ¶ 37; *Brooks*, 2023 IL App (1st) 200435, ¶ 100. We reach the same result here.

¶ 48    As noted, the first step of the *Bruen* analysis is to determine whether the plain text of the second amendment covers the challenged conduct. See *Bruen*, 597 U.S. at 17. We observe that courts have reached differing conclusions on the question of whether possession of a firearm by a felon is encompassed by the plain text of the second amendment, with some courts concluding that the second amendment does not apply to individuals who are not "law-abiding citizens." See, *e.g.*, *People v. Macias*, 2025 IL App (1st) 230678, ¶ 28 (noting split in approach); *Grace*, 2025 IL App (1st) 232429-U, ¶¶ 14-16 (same).

¶ 49    Here, we agree with defendant that his status as a felon is more appropriately considered under the second step of the *Bruen* analysis and that the challenged conduct under the statute—possession of a firearm—is encompassed by the plain text of the second amendment. See 720 ILCS 5/24-1.7(a) (West 2022) (prohibiting an individual from "receiv[ing], sell[ing], possess[ing], or transfer[ring] any firearm" after having been convicted of two qualifying offenses); see also *Brooks*, 2023 IL App (1st) 200435, ¶¶ 84-87 (finding that, for purposes of the armed habitual criminal statute, the "proscribed conduct" was the possession of a firearm, which is encompassed by the plain text of the second amendment); *Macias*, 2025 IL App (1st) 230678, ¶ 28 (same); *People v. Doehring*, 2024 IL App (1st) 230384, ¶ 24 (finding that a focus on the conduct being proscribed instead of the circumstances surrounding such possession "better comports with the requirements in *Bruen*").

¶ 50    We agree with the State, however, that under the second step of the *Bruen* analysis, the armed habitual criminal statute is consistent with the historical tradition of firearm regulation. In *Brooks*, a different division of this court conducted an extensive analysis of the historical tradition related to the disarming of felons—violent and nonviolent—in comparison with the armed habitual criminal statute. See *Brooks*, 2023 IL App (1st) 200435, ¶¶ 90-105. We find

the analysis contained therein amply supports a finding that the armed habitual criminal statute is consistent with the nation's history of firearm regulation and, therefore, agree with the numerous courts that have upheld the constitutionality of the statute under the second amendment.

¶ 51    Defendant also contends that the armed habitual criminal statute separately violates article I, section 22, of the Illinois Constitution, which he claims provides broader protections than the second amendment. Our supreme court has indicated that the Illinois Constitution does not mirror the second amendment. See *Kalodimos v. Village of Morton Grove*, 103 Ill. 2d 483, 491 (1984). We nevertheless observe that laws prohibiting felons from possessing firearms have been repeatedly held to be consistent with the Illinois Constitution, and we agree with those courts that have found such statutes constitutional. See, *e.g.*, *Travis*, 2024 IL App (3d) 230113, ¶¶ 38-43; *People v. Stephens*, 2024 IL App (5th) 220828, ¶¶ 40-44.

¶ 52    *Sentencing*

¶ 53    The final issues raised by defendant concern his sentencing. Specifically, defendant claims that (1) the trial court relied on an incorrect version of defendant's criminal history, (2) the trial court improperly relied on defendant's predicate convictions in aggravation, (3) defendant's sentence was excessive, and (4) defendant's convictions for being an armed habitual criminal and unlawful possession of a weapon by a felon violate the one-act, one-crime rule.

¶ 54    Criminal History

¶ 55    Defendant first contends that the trial court relied on an incorrect version of his criminal history in sentencing him to eight years in the IDOC. Defendant's PSI indicated that defendant had three felony convictions, including a 2018 conviction for "Harass Witness/Fam Membr," for which he had been sentenced to 24 months of probation. Prior to hearing arguments in

aggravation and mitigation, the trial court asked whether either side had any corrections to the PSI, and neither did. On appeal, however, defendant claims that he was not convicted of a felony on that case but instead was convicted only of misdemeanor disorderly conduct. He therefore claims that the trial court's reliance on his "felony" conviction rendered his sentencing unfair.

¶ 56    As an initial matter, we note that defendant never informed the trial court that the PSI was incorrect as to this conviction, nor did he otherwise object to the criminal history set forth therein, either during the sentencing hearing or in his postsentencing motion. Sentencing issues are required to be raised in the trial court in the first instance in order to preserve them for appellate review. *People v. Reed*, 177 Ill. 2d 389, 393 (1997); see 730 ILCS 5/5-4.5-50(d) (West 2022). A trial court's reliance on an improper factor in sentencing, however, may be reviewed for plain error, and defendant urges us to do so here. See *People v. Whitney*, 297 Ill. App. 3d 965, 967 (1998).

¶ 57    The plain-error doctrine permits a reviewing court to consider an unpreserved claim (1) if a clear or obvious error occurred and the evidence is so closely balanced that this error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) if a clear or obvious error occurred and the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence at defendant's trial. *People v. Johnson*, 2024 IL 130191, ¶ 43; *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). In a plain-error analysis, it is the defendant who bears the burden of persuasion. *Johnson*, 2024 IL 130191, ¶ 43. The first step under either prong of the plain-error doctrine is to determine whether there was an error at trial and whether this error was clear or obvious. *Id.* ¶ 44; *Piatkowski*, 225 Ill. 2d at 565.

¶ 58    In this case, the parties agree that the PSI incorrectly referred to defendant's 2018 conviction as a felony rather than a misdemeanor. The State, however, claims that this error was not clear or obvious, as required for plain-error review, as there is no indication that the characterization of the conviction played any role in the trial court's sentencing.

¶ 59    While sentencing defendant, the trial court relied heavily on defendant's criminal history, observing that defendant "basically started a life of crime at an early age" after his 2018 conviction, which the trial court referred to as "his first foray into the felony realm." The trial court noted that, while on probation for that conviction, defendant was convicted of five misdemeanors and, "mind you, he's still on felony probation and he could have been sentenced by that judge to the penitentiary on either [*sic*] one of those violations. But luckily for him he did not." The trial court further noted that, "even while on that felony probation, May 1st, 2020, he picked up a gun case, his first gun case." As defendant was sentenced to a year in the IDOC on that charge, by the same judge who had sentenced him in the harassment case, the trial court "assume[d] that the probation was terminated unsatisfactorily." After being released, less than a year later, "he picks up another gun case," for which he was sentenced to a year in the IDOC. Less than a year later, he was convicted of retail theft and, later that same year, was convicted of battery, retail theft, and criminal damage to property.

¶ 60    In determining whether a sentence was improper, the reviewing court must consider the record as a whole, instead of focusing only on a few words. *People v. Ward*, 113 Ill. 2d 516, 526-27 (1986); *People v. Bowen*, 2015 IL App (1st) 132046, ¶ 50. Here, the trial court's comments make clear that it was relying on defendant's continuous course of criminal activity, beginning from his first conviction in 2018. While the trial court relied on that conviction as part of defendant's history, there is no indication that the trial court treated it any differently

24

due to its character as a felony, as opposed to a misdemeanor. In fact, the record reveals the opposite—in reciting defendant's criminal history, the vast majority of defendant's convictions were for misdemeanors, which the trial court treated as equally weighty in its analysis. We further observe that the most important parts of the trial court's reliance on the conviction—that it occurred when defendant was 19 or 20 years old and that he received probation, during which time he committed additional offenses—remain entirely accurate. We thus cannot find that the trial court's reliance on the conviction was error, even though it was misinformed as to the class of the offense. Absent a clear and obvious error, there can be no plain error and, therefore, reversal of defendant's sentence is not warranted.

¶ 61       Moreover, even if the trial court's reliance on the conviction constituted error, it would not rise to the level of plain error. While the parties agree that reliance on an improper sentencing factor represents second-prong plain error, our supreme court has recently clarified otherwise. In *Johnson*, our supreme court explained that such a sentencing error is not a structural error subject to second-prong plain-error review, but instead is subject to review under the first prong of the plain-error doctrine. *Johnson*, 2024 IL 130191, ¶ 96. Under that prong, an error rises to the level of plain error only where the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant. *Id.* ¶ 43. Here, defendant does not contend that the trial court's erroneous belief that the conviction was a felony tipped the scales of justice against him, and we cannot find that it did.

¶ 62       For the same reasons, we find no merit to defendant's alternative argument of ineffective assistance of counsel. Even if counsel should have corrected the PSI to accurately reflect the class of defendant's 2018 conviction, defendant was not prejudiced by the failure to do so. See *People v. Henderson*, 2013 IL 114040, ¶ 11 (a claim of ineffective assistance of counsel fails

where the defendant cannot establish that a reasonable probability exists that, absent the error, the result of the proceeding would have been different); see also *People v. White*, 2011 IL 109689, ¶ 133 (the prejudice prong for ineffective assistance of counsel is similar to the first-prong plain-error analysis).

¶ 63                                    Double Enhancement

¶ 64        Defendant next contends that the trial court relied on his two predicate convictions in aggravation when sentencing him, representing an improper double enhancement. As with his prior sentencing claim, defendant did not preserve this issue for appeal but requests that we review it for plain error. We thus begin with the question of whether a clear and obvious error occurred. See *Johnson*, 2024 IL 130191, ¶ 43.

¶ 65        Generally, a single factor may not be used both as an element of the crime and as an aggravating factor justifying the imposition of a harsher sentence. *People v. Gonzalez*, 151 Ill. 2d 79, 83-84 (1992); see *People v. Brown*, 2018 IL App (1st) 160924, ¶ 19. In this case, defendant's prior convictions for aggravated unlawful use of a weapon served as predicate offenses for the instant armed habitual criminal conviction. See 720 ILCS 5/24-1.7(a)(2) (West 2022) (listing aggravated unlawful use of a weapon as a predicate offense). Defendant thus contends that the trial court erred by also using these convictions in sentencing him to more than the statutory minimum sentence. We disagree.

¶ 66        In considering a similar challenge under the armed habitual criminal statute, a different division of this court explained that "while the *fact* of [the defendant's] prior [unlawful use or possession of a weapon by a felon] conviction determined his eligibility for an [armed habitual criminal] charge, it is the *nature and circumstances* of that conviction which, along with other factors in aggravation and mitigation, determined the exact length of his sentence." (Emphases

26

in original.) *Brown*, 2018 IL App (1st) 160924, ¶ 21 (citing *People v. Thomas*, 171 Ill. 2d 207, 227-28 (1996)). The *Brown* court thus found that the use of the predicate conviction in the context of considering the defendant's overall criminal history did not represent an improper double enhancement. *Id.* ¶ 22; see *People v. Sherman*, 2020 IL App (1st) 172162, ¶ 54 (finding no improper double enhancement in considering the burglaries underlying the defendant's armed habitual criminal charge, as the weighing of the defendant's criminal history is a required element of sentencing).

¶ 67 In this case, as noted, the trial court focused on defendant's continuous criminal history in finding that a sentence above the minimum was appropriate. The trial court observed that, contrary to defendant's claims that he had changed his ways, his criminal history was recent. The trial court further noted that defendant had 10 convictions in the span of five years and warned that, "if you keep catching new offenses, that's what's going to happen, your sentencing is going to be longer and longer and longer." We thus cannot find that the trial court's references to defendant's predicate convictions in this context represented an improper double enhancement. As there was no error, there can be no plain error, and reversal of defendant's sentence is not warranted. See *Johnson*, 2024 IL 130191, ¶ 43. Defendant's alternative argument of ineffective assistance is similarly flawed, as counsel was not ineffective in failing to raise this argument below. See *Henderson*, 2013 IL 114040, ¶ 11 (a claim of ineffective assistance of counsel fails where the defendant cannot establish that counsel's performance fell below an objective standard of reasonableness).

¶ 68 Excessive Sentence

¶ 69 Defendant also claims that his sentence was excessive. As a class X felony, the sentencing range for being an armed habitual criminal is 6 to 30 years. See 720 ILCS 5/24-1.7(b) (West

2022); 730 ILCS 5/5-4.5-25(a) (West 2022). The trial court in this case sentenced defendant to eight years, which defendant contends was unwarranted based on his nonviolent criminal history and other mitigating factors.

¶ 70    "Illinois courts have long recognized that the imposition of a sentence is left to the sound discretion of the trial court and will not be altered upon review absent an abuse of that discretion." *People v. Etherton*, 2017 IL App (5th) 140427, ¶ 15. The trial court's sentence is given great deference, as "the trial court is in the best position to consider the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *Id.* In determining whether the trial court based its sentence on appropriate aggravating and mitigating factors, " 'a court of review should consider the record as a whole, rather than focusing on a few words or statements by the trial court.' " *People v. Merriweather*, 2022 IL App (4th) 210498, ¶ 31 (quoting *People v. Dowding*, 388 Ill. App. 3d 936, 943 (2009)).

¶ 71    In this case, as noted, the trial court gave the most weight to defendant's criminal history, finding that defendant had continuously been involved in criminal activity since his first conviction in 2018, including repeated convictions while on probation or immediately after being released from incarceration. While defense counsel presented evidence in mitigation, including his nonviolent nature, his involvement in the community, and his family support, the trial court was entitled to determine that his demonstrated behavior warranted a sentence that was longer than the six-year minimum. Accordingly, we cannot find that the trial court abused its discretion in sentencing defendant to eight years in the IDOC.

¶ 72                                    One-Act, One-Crime

¶ 73    Finally, defendant contends that the trial court erred in entering convictions on both the armed habitual criminal count and the unlawful possession of a weapon by a felon count. Under

the one-act, one-crime rule, multiple convictions are improper if they are based on the same physical act. *People v. Smith*, 2019 IL 123901, ¶ 13. Whether a defendant was incorrectly sentenced for multiple offenses based upon the same act is a question of law that this court reviews *de novo*. *People v. Coats*, 2018 IL 121926, ¶ 12.

¶ 74     As with several of his other sentencing claims, defendant failed to preserve the issue for review by raising it in the trial court. Our supreme court, however, has indicated that an alleged one-act, one-crime violation is reviewable under the second prong of the plain-error doctrine, as it implicates the integrity of the judicial process. *Smith*, 2019 IL 123901, ¶ 14.

¶ 75     In this case, defendant contends that both of his convictions were based on precisely the same physical act, namely, his possession of the firearm, and, therefore, multiple convictions were not permitted. The State agrees, as do we. As both of defendant's convictions were premised on the possession of the same firearm, they violate the one-act, one-crime rule, and the less serious offense must be vacated. See, *e.g.*, *People v. Gomez*, 2018 IL App (1st) 150605, ¶ 36 (finding a one-act, one-crime violation where defendant was convicted of both aggravated unlawful use of a weapon and being an armed habitual criminal, based on the possession of a single firearm, and ordering the lesser count vacated); *People v. West*, 2017 IL App (1st) 143632, ¶ 25 (same). We accordingly vacate the less serious offense of unlawful possession of a weapon by a felon and direct the clerk of the circuit court to correct defendant's mittimus by vacating the unlawful use of a weapon by a felon conviction.

¶ 76                                                     CONCLUSION

¶ 77     Defendant's conviction for being an armed habitual criminal is affirmed, where there was sufficient evidence to prove defendant's constructive possession of the subject firearm beyond a reasonable doubt and where neither the armed habitual criminal statute nor the aggravated

unlawful use of a weapon statutes underlying his predicate convictions are unconstitutional. Defendant's sentence is affirmed, where he failed to establish that the trial court relied on improper sentencing factors and where his sentence was not excessive. We vacate, however, defendant's conviction for unlawful possession of a weapon by a felon, as it violates the one-act, one-crime rule, and order the mittimus corrected accordingly.

¶ 78        Affirmed in part and vacated in part; mittimus corrected.

***People v. Wade*, 2025 IL App (1st) 231683**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 23-CR-1281; the Hon. John F. Lyke, Judge, presiding. |
| **Attorneys for Appellant:** | DePaul University Legal Clinic, of Chicago (Gilbert C. Lenz and John R. Breffeilh, of counsel, and Madison Houghton, Caroline Whang, and Anahita Safarzadeh, law students), for appellant. |
| **Attorneys for Appellee:** | Eileen O'Neill Burke, State's Attorney, of Chicago (John E. Nowak, Brian A. Levitsky, and Tasha-Marie Kelly, Assistant State's Attorneys, of counsel), for the People. |