2025 IL App (1st) 231267-U

No. 1-23-1267

Order filed November 17, 2025.

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 3799 |
| | ) | |
| DELFINA BAUTISTA, | ) | The Honorable |
| | ) | Marc W. Martin, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial evidence sufficiently showed defendant had the requisite mental state to commit aggravated battery. The jury's verdicts of aggravated battery and reckless conduct were not legally inconsistent, the jury instructions and verdict forms provided to the jury were not improperly confusing, and the court didn't improperly consider defendant's assertion of innocence as a factor in aggravation at sentencing. We vacate defendant's conviction for reckless conduct as it violates the one-act, one-crime doctrine.

¶ 2    Following a 2023 jury trial, defendant Delfina Bautista was found guilty of aggravated

battery and reckless conduct, based on a 2018 incident in which she shook A.V., a five-month-old

infant, causing A.V. permanent physical and mental disabilities. Defendant was sentenced to 15 years for aggravated battery and a concurrent term of 3 years for reckless conduct. On appeal, she asserts that the State failed to prove her guilty of aggravated battery beyond a reasonable doubt, that the trial judge failed to properly instruct the jury, and that the jury returned legally inconsistent verdicts. She also challenges her sentence on the basis that the trial court improperly considered her assertion of innocence as a factor in aggravation, and that her sentence for aggravated battery was excessive. Finally, defendant argues, and the State concedes, that her reckless conduct conviction should be vacated because it violates the one-act, one-crime doctrine. We vacate defendant's reckless conduct conviction and otherwise affirm.

¶ 3                                    BACKGROUND

¶ 4                                    A. Indictment

¶ 5      Defendant was charged by indictment with three counts of aggravated battery to a child (720 ILCS 5/12-3.05(b)(1) (West 2018)). The State proceeded to trial on Count I, which alleged aggravated battery based on causing A.V. great bodily harm (specifically, subdural hematoma), and Count II, which alleged aggravated battery based on causing A.V. permanent disability (specifically, brain damage).

¶ 6                                    B. Trial

¶ 7                                    1. State's Evidence

¶ 8      At trial, the State called A.V.'s mother Maria V., Maria's sister Rosa V., defendant's romantic partner Marvin Gutierrez, medical professionals who treated A.V., a social worker who worked with Maria and A.V., and law enforcement officials who investigated the case.

¶ 9                          a. The February 16, 2018, Incident

¶ 10 Around July 2017, Maria moved to Hoffman Estates while pregnant with A.V. There, she lived in an apartment unit with her father and Rosa. Maria befriended defendant, who lived in a unit across the hall from them. At that time, defendant had infant twins and a then-seven-year-old daughter named C.B. In September 2017, A.V. was born. Maria began working at a restaurant in January 2018, and defendant agreed to take care of A.V. when Maria worked.

¶ 11 On the morning of February 16, 2018, Maria left A.V. with defendant. A.V. seemed "really happy." The State entered photographs from Maria's phone depicting text messages and pictures sent between defendant and Maria that day. They reflected that, around 1:40 p.m., defendant texted Maria that C.B. had become "such a piece of shit" and would hit her twins. About three hours later, defendant texted Maria that A.V. didn't like C.B. because C.B. was making A.V. cry. Around 5:18 p.m., defendant texted Maria that she didn't want to care for A.V. anymore because she didn't want to be responsible if "something happens." Defendant elaborated that C.B. had thrown one of the twins to the floor, and she was worried C.B. would "kill one of them one day."

¶ 12 After 9 p.m., defendant left the children alone at home and picked up her partner Gutierrez from work. When she returned home with Gutierrez, she told Gutierrez that A.V. was breathing "very strong" and she thought A.V. wasn't "doing well." Maria testified that she returned from work and picked up A.V. after 11 p.m. She noticed A.V.'s body was "really loose" and asked defendant what was wrong. Defendant replied that nothing was wrong, but A.V. had been "fussy," threw up, and didn't slept much. Back at her apartment, Maria noticed A.V. seemed "really weak," her eyes were partially shut, and she was breathing unusually. She texted defendant, who took Maria and A.V. to the hospital. A.V. was admitted to intensive care. At 3:18 a.m., defendant texted Maria, "Don't tell them that I [left] them alone. I'm afraid they will take away my daughters."

¶ 13                                  b. A.V.'s Treatment at the Hospital

¶ 14    On February 17, 2018, pediatric radiologist Dr. Kerry Conneely performed a CT scan of A.V.'s head. The results showed that A.V.'s "soft spot" was bulging and had been pushed out, and there were collections of blood pressing on her brain. Dr. Conneely testified that, for children at A.V.'s age, these injuries most frequently resulted from a "non-accidental injury." Pediatric physician Dr. Catherine Humikowski testified that, based on her notes from that date, she suspected A.V.'s injury was a "nonaccidental traumatic injury," which was typically said in pediatrics when there was suspected child abuse. A neurosurgeon performed subdural taps on A.V. to drain the fluid collecting in her head.

¶ 15    On February 18, 2018, Dr. Conneely performed an MRI on A.V.'s head, which indicated signs of brain damage and a loss of blood flow to the brain. Dr. Humikowski observed that A.V.'s soft spot was swelling, and she wouldn't open her eyes spontaneously. Her temperature was unstable, she had seizures, and her blood's ability to clot was impaired. Dr. Humikowski didn't document any visible bruises on A.V. She explained, however, that external bruises were not typical in many "nonaccidental neurologic injuries" suffered by babies, as "it doesn't take the kind of force you *** would imagine to sustain this level of injury." Dr. Humikowski stated, "[T]here can be significant force generated in the brain from something like a shake or even a violent physical manipulation of the body."

¶ 16    Following the incident, A.V. had to use a wheelchair because she couldn't walk. She wore a helmet because she often hurt her head. She couldn't speak or eat through her mouth and had to be fed through a tube.

¶ 17                                  c. Law Enforcement Testimony

¶ 18    Hoffman Estates police detective Alvaro Fernandez investigated the incident on February 18, 2018. At 9 p.m., he interviewed defendant at a police station, and Detective Ron Gad later joined. Another interview was conducted on February 19 with Gad present. Fernandez and the assistant State's attorney (ASA) read into the record a transcript of the Spanish portions of the interviews, which were translated into English. Video recordings of the English portions of the interviews were also published to the jury. We have viewed those videos, which are part of the record on appeal.

¶ 19    In the video of the first interview, which took place on February 18, defendant initially denied that she saw A.V. "get hurt or anything" when she was watching A.V. on February 16. Later in the interview, Alvarez and Gad left the room, reentered, and then read defendant her *Miranda* rights. Defendant repeatedly said she never shook or did "anything" to A.V. After further questioning, however, she said, "I did grab her and I shaked [*sic*] her." Defendant then elaborated that on the night of February 16, just before Maria picked up A.V. around 11 p.m., defendant took A.V. to her room to look at her because A.V. was "sleepy" and breathing unusually. Defendant looked at A.V.'s eyes, held her up, and felt that A.V. "wasn't okay." She then shook A.V. and "was like, 'Are you okay, baby, are you okay?' " In the video, defendant demonstrated by holding her hands out and rapidly rocking them back and forth. Defendant stated that A.V.'s head moved back and forth twice when defendant shook her.

¶ 20    In the video of the interview that took place on February 19, defendant stated that, after she returned from picking up Gutierrez, C.B. told defendant that she was playing with the baby and "fell," but it was an "accident." C.B. wouldn't tell defendant anything else. Defendant characterized C.B. as "aggressive."

¶ 21  Also on February 19, Federal Bureau of Investigations (FBI) Special Agent William Noser conducted a recorded interview, which the State published to the jury. We have reviewed the video, which is also included in the appellate record. In that video, defendant stated that around 8:40 p.m., she took a shower and got dressed. A.V. was crying a lot on the bed. Defendant picked her up and shook her to "shut [her] up." She then put A.V. in her bouncy seat in the living room so A.V. would "be quiet," because it was "frustrating." Defendant initially told Noser she shook A.V. three times. She later said, however, that she shook A.V. about six to eight times "hard." A.V.'s head flew back and forth. Noser asked defendant to estimate how hard she shook A.V. on a scale of 0 to 10, with 10 meaning "with all your might." Defendant confirmed it was a "10." She also confirmed she shook A.V. because she was frustrated that A.V. wouldn't calm down and "lost it." A.V. stopped crying after defendant shook her. Defendant knew A.V. was unconscious and left her in her bouncy seat to pick up Gutierrez because she was scared and knew she "did something wrong." Defendant returned home and noticed A.V. was having difficulty breathing.

¶ 22                           2. Defendant's Witnesses

¶ 23  C.B., who was 12 years old at the time of trial, testified that A.V. began crying when defendant left to pick up Gutierrez from work. C.B. stated that she forced a bottle into A.V.'s mouth, shook her 8 to 10 times, hit A.V.'s head on the plastic surface of her bouncy seat, and dropped A.V. onto the floor 4 times.

¶ 24  Defendant testified that, throughout February 16, 2018, C.B. was angry and screamed at and pushed the other children. After defendant picked up Gutierrez and the family ate dinner, defendant heard A.V. gasping for air. Defendant picked A.V. up, and her head and eyes rolled back. Defendant saw A.V. had breathing issues and shook her two or three times, but didn't mean

to hurt her. Defendant asked C.B. what she did to A.V., and C.B. said "it was an accident." Defendant denied on cross that she shook A.V. six to eight times, or that A.V.'s head flew back and forth.

¶ 25                    3. Jury Instructions, Closing Arguments, and Verdicts

¶ 26    The State submitted one separate set of jury instructions each for aggravated battery based on great bodily harm and aggravated battery based on permanent disability. Defendant submitted jury instructions on the lesser-included offense of reckless conduct, also with a separate set of instructions corresponding to each of her two aggravated battery charges. The court provided a modified verdict form for each of the two charges.

¶ 27    During closing arguments, the State asserted the evidence showed that defendant caused great bodily harm, as her soft spot was bulging and she had subdural hematomas, or collections of blood pressing on the brain. The State explained there was a second aggravated battery charge that was "slightly different," as it was based on defendant knowingly causing permanent disability to A.V. Namely, the State explained there was additional evidence that A.V. suffered a restricted flow of blood to the brain, causing a permanent disability, as A.V. could no longer walk, talk, or eat without a feeding tube.

¶ 28    The jury found defendant guilty of aggravated battery of a child causing great bodily harm and reckless conduct causing permanent disability.

¶ 29                    C. Posttrial Motion and Sentencing

¶ 30    Defendant filed a motion for new trial alleging in part that the jury returned legally inconsistent verdicts, as she couldn't have been found guilty of two offenses based on the same

conduct but two different mental states (knowledge and recklessness). The court denied the motion and immediately proceeded with sentencing.

¶ 31    At sentencing, the trial court considered defendant's presentence investigation report (PSI). The PSI, as corrected on the record, reflected that defendant was then 35 years old and had six children. Defendant reported having a "great" relationship with her children and spent every day with them, though her relationship with C.B. became strained after her arrest. Gutierrez helped support the children. Defendant attended college for two years studying early childhood education and she was a babysitter at the time of the arrest. Defendant stated she felt sad about "what happened" in the case. She also said she maintained her innocence.

¶ 32    In aggravation, the ASA read Maria's victim impact statement into the record. Maria stated that when she met defendant, defendant seemed like a "good woman," and Maria liked how defendant treated her own children. Maria gave defendant "complete trust" in caring for A.V. Maria now had to feed A.V. through a tube, give her five different medications a day, and carry her. Maria also had to check on A.V. while she slept because A.V. would have seizures. Because of A.V.'s needs, Maria couldn't have a stable job. She couldn't "go places or do things" with A.V. Crowds of people and loud noises would cause A.V. to cry and hit herself. Maria asked for justice for A.V. because A.V. would never be a "normal girl" or live an independent life.

¶ 33    The State argued in aggravation that defendant held a position of trust as a babysitter for A.V. when committing the crime, and defendant's actions "changed that five-month-old's life forever." Further, the State asserted it was "egregious" that, during trial, defendant had her own daughter, C.B., take the blame for her actions. The State declined to recommend a specific sentence but argued that the sentence should deter others from committing the same crime.

¶ 34    In mitigation, defense counsel submitted a number of letters from acquaintances of defendant speaking positively about defendant's character. Counsel told the court that his firm had asked defendant's family members and friends to provide letters, and they received 80 to 100 letters. Defense counsel also called multiple witnesses. Gutierrez testified that his daughters felt "very safe" around defendant and he had never seen defendant mistreat their children. Defendant's neighbor of four years described defendant as a "very caring person" who was "always there." The neighbor stated she would "[a]bsolutely" trust defendant with her own child. Defendant's younger sister testified that defendant was a "wonderful" mother and sister, a "great" daughter, and "so respectful in every way."

¶ 35    Defense counsel argued in mitigation that the incident was "one dark moment" for a person who was, "by all accounts, a person of excellent character." Counsel stated that defendant wasn't an "evil person," but a "helper" who pursued a field of work where she could help others. He also argued that defendant's incarceration would affect her children, who were still in their formative years. Defense counsel requested a minimum sentence of six years' imprisonment.

¶ 36    The trial court sentenced defendant to 15 years' imprisonment for aggravated battery to a child causing great bodily harm, with a concurrent term of 3 years for reckless conduct causing permanent disability.[1] The court stated that, in mitigation, defendant had no criminal history and

---

[1]As stated, the jury found defendant guilty of aggravated battery causing great bodily harm and reckless conduct causing permanent disability. The mittimus in the record, however, incorrectly reflects defendant received 15 years for aggravated battery causing permanent disability and 3 years for reckless conduct causing great bodily harm. Nonetheless, in orally pronouncing its sentence, the court correctly stated that defendant's sentence for aggravated battery was based on Count I of the indictment (great bodily harm) and her sentence for reckless conduct was based on Count II (permanent disability). Because the trial court's oral pronouncement of a sentence controls over the written order, we find the court's sentencing decision consistent with the jury's verdicts. See *People v. Davis*, 2023 IL App (1st) 231856, ¶ 34.

the circumstances of the offense were unlikely to recur. The court also noted that defendant's children depended on her for emotional and financial support. The court found the evidence was "mixed," however, as to whether defendant was likely to commit another crime. The court reasoned that, while defendant had been on bond for a "substantial period" without violations, she also lied about "material matters" at trial and didn't show "one iota of remorse."

¶ 37 The court stated it couldn't impose the minimum sentence "[g]iven the serious nature of this offense." It further found deterrence an appropriate factor in aggravation, as was the fact that defendant was in a position of trust as A.V.'s babysitter. Additionally, the court emphasized that defendant attempted to shift the blame for the offense onto her seven-year-old daughter "since the very inception of the investigation." The court declined to consider the great bodily harm inflicted or A.V.'s age as "independent" aggravating factors, as those were essential elements of the offense. The court concluded that defendant's "own actions for which she has not ever acknowledge[d] responsibility" were the reason she faced a "significant penitentiary sentence."

¶ 38 Defendant didn't file a motion to reconsider her sentence but timely filed a notice of appeal.

¶ 39                                    ANALYSIS

¶ 40                         A. Sufficiency of the Evidence

¶ 41 Defendant now argues that the trial evidence was not sufficient to prove her guilty beyond a reasonable doubt of aggravated battery, as there was no evidence that she had the requisite mental state of knowledge to commit the crime.

¶ 42 When reviewing a challenge to the sufficiency of the evidence, our question is " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in

original.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This standard applies to both direct and circumstantial evidence. *People v. Aljohani*, 2022 IL 127037, ¶ 66), and a conviction may be sustained on circumstantial evidence alone (*People v. Grayer*, 2023 IL 128871, ¶ 28).

¶ 43     To sustain defendant's conviction for aggravated battery, the State had to show that defendant knowingly and without legal justification caused great bodily harm to a child under the age of 13 years. 720 ILCS 5/12-3.05(b)(1) (West 2018). Defendant acknowledges that she admitted to shaking A.V. Her sole contention on appeal is that the State didn't prove the requisite mental state for aggravated battery, *i.e.*, that she *knowingly* caused A.V. great bodily harm.

¶ 44     A person knows, or acts knowingly of, "[t]he result of his or her conduct *** when he or she is consciously aware that that result is practically certain to be caused by his conduct." 720 ILCS 5/4-5(b) (West 2018). To act knowingly under the aggravated battery statute, a defendant must be consciously aware that her conduct is practically certain to cause great bodily harm. *People v. Isunza*, 396 Ill. App. 3d 127, 132 (2009). Further, a defendant is presumed to intend the natural and probable consequences of her acts. *People v. Janosek*, 2021 IL App (1st) 182583, ¶ 43. "The intent to commit a criminal offense need not be expressed, but may be inferred from the conduct of the defendant and the surrounding circumstances." (Internal quotation marks omitted.) *Grayer*, 2023 IL 128871, ¶ 28. Intent is typically proven through circumstantial evidence, as direct evidence of intent is rare. *People v. Pittman*, 2014 IL App (1st) 123499, ¶ 16. Knowledge is a question of fact for the trier of fact to decide. *People v. Frazier*, 2016 IL App (1st) 140911, ¶ 23.

¶ 45     Here, the State submitted testimony that defendant was watching A.V., alongside her own children, throughout February 16, 2018. She expressed frustration with the children over text

messages with A.V.'s mother Maria. When Maria picked up A.V. from defendant's apartment that night, she noticed something was wrong with A.V. and asked defendant about it. Defendant denied anything was wrong but then offered to take A.V. to the hospital. Defendant's reaching out to get A.V. medical treatment supported an inference that she was consciously aware her actions would severely injure A.V. See *People v. Rader*, 272 Ill. App. 3d 796, 804-05 (1995) (evidence sufficiently showed the defendant knowingly caused great bodily harm, where the defendant sought medication attention for a baby after shaking him). Moreover, a rational trier of fact could have inferred that defendant, as a mother of multiple children, knew the injuries that could occur from shaking a baby.

¶ 46 Defendant later admitted to Special Agent Noser that, sometime between 8 and 9 p.m. on February 16, she had shaken defendant six or eight times "hard" out of frustration because A.V. wouldn't stop crying. She confirmed that she did so "with all [her] might." See *People v. Collins*, 2021 IL App (1st) 170597, ¶ 65 (a confession is the most powerful piece of evidence the State can offer). Even further, defendant told Noser that, soon after shaking A.V., she left A.V. at home because she was scared and knew she did "something wrong," suggesting she was aware of the seriousness of having shaken A.V. *Grayer*, 2023 IL 128871, ¶ 28 (intent may be inferred from the conduct of the defendant and surrounding circumstances). Contrary to defendant's argument on appeal, the fact that defendant stated she "lost it" and shook A.V. out of frustration couldn't have reduced defendant's mental state, as "[a] bad temper is no excuse for violence and does not reduce a mental state from knowledge to recklessness." *Kibayasi*, 2013 IL App (1st) 112291, ¶ 46 (citing *People v. Rodriguez*, 275 Ill. App. 3d 274, 285 (1995)).

¶ 47    Additionally, the State submitted extensive testimony from medical personnel regarding the extent of A.V.'s injuries. Drs. Conneely and Humikowski both testified regarding the severity of A.V.'s injuries, stating that they were typically nonaccidental in nature. Dr. Humikowski stated that a "shake" or "violent physical manipulation of the body" could generate "significant force" in a baby's brain. This testimony, combined with defendant's admission that she shook A.V. "hard" out of frustration, supported an inference that A.V.'s injuries could not have been the result of a mere accident, but rather an intentional, violent act. See *People v. Kibayasi*, 2013 IL App (1st) 112291, ¶ 43 (evidence sufficient to show knowledge where the defendant admitted to shaking a baby out of frustration, and medical testimony showed the victim's subdural hematoma was severe and could only be caused by a violent act of shaking). Given the overwhelming amount of circumstantial evidence and defendant's own admission to having shaken A.V. "hard" out of frustration, we find the evidence was far from being "so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *Aljohani*, 2022 IL 127037, ¶ 67. We therefore affirm defendant's conviction for aggravated battery.

¶ 48                    B. Legally Inconsistent Verdicts

¶ 49    Defendant also asserts that she is entitled to a new trial because the jury returned legally inconsistent verdicts on knowing and reckless offenses (aggravated battery to a child and reckless conduct) based on the same act (shaking A.V.).

¶ 50    "Legally inconsistent verdicts occur when an essential element of each crime must, by the very nature of the verdicts, have been found to exist and to not exist even though the offenses arise out of the same set of facts." (Internal quotation marks omitted.) *People v. Boyd*, 2021 IL App (1st) 182584, ¶ 57. Where there are legally inconsistent verdicts, the trial judge has a duty to send

the jury back for further deliberations after additional instructions to resolve the inconsistency. *People v. Porter*, 168 Ill. 2d 201, 214 (1995). A trial court's failure to send the jury back for further deliberations to resolve inconsistent verdicts mandates a reversal and new trial on all counts. *Id.* at 214-15. "The manner in which a defendant is charged, and the jury is instructed, provides the essential framework for analyzing the consistency of jury verdicts." *People v. Davidson*, 2023 IL App (2d) 220140, ¶ 62) (citing *People v. Spears*, 112 Ill. 2d 396, 405 (1986)). There is no inconsistency in verdicts upon charges of crimes composed of different elements although rising out of the same set of facts. *People v. Gorka*, 374 Ill. App. 3d 85, 90 (2007). We review *de novo* whether two verdicts are legally inconsistent. *Boyd*, 2021 IL App (1st) 182584, ¶ 57.

¶ 51    Defendant claims that the jury's verdicts for aggravated battery and reckless conduct were inconsistent because they required two different mental states (knowledge and recklessness) despite being based on the same act (shaking A.V.). As we have stated a person knows the result of her conduct when she's consciously aware that that result "is practically certain to be caused by his conduct." 720 ILCS 5/4-5(b) (West 2018). Because the aggravated battery statute defines aggravated battery "in terms of a particular result," a person is said to act knowingly when she is consciously aware that her conduct is "practically certain to cause the result." *People v. Psichalinos*, 229 Ill. App. 3d 1058, 1067 (1992); see also *People v. Castillo*, 2018 IL App (1st) 153147, ¶ 26. A person commits reckless conduct, on the other hand, by recklessly performing an act that causes great bodily harm, permanent disability, or disfigurement to another person. 720 ILCS 5/12-5(a)(2) (West 2018). A person acts recklessly when she "consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow," and that

disregard "constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation." 720 ILCS 5/4-6 (West 2018).

¶ 52    Here, the jury was instructed as to defendant's two charges of aggravated battery respectively based on defendant causing great bodily harm and permanent disability. See *Davidson*, 2023 IL App (2d) 220140, ¶ 62 (manners in which the defendant is charged and the jury is instructed are relevant in determining verdicts' consistency). As was explained to the jury during closing arguments, the charge alleging great bodily harm was based on defendant causing A.V.'s subdural hematomas, while the charge alleging permanent disability was based on defendant causing A.V. permanent brain damage. See *People v. Olaska*, 2017 IL App (2d) 150567, ¶ 127 (closing arguments are instrumental in forming a jury's understanding of the law and can compensate for any confusing aspects of the instructions).

¶ 53    Ultimately, we find no legal inconsistencies in the jury finding that defendant knowingly caused A.V. great bodily harm but did not knowingly cause her permanent disability. The two aggravated battery counts concerned two different harms. See *People v. Bustamante*, 334 Ill. App. 3d 515, 521-22 (2002) (whether offenses concern the same harm is a relevant factor when reviewing verdicts for inconsistency). As such, the State essentially had to prove a different set of facts for each of the two aggravated battery counts, *i.e.* that defendant was consciously aware that shaking A.V. was practically certain to cause either (1) great bodily harm (subdural hematoma) or (2) or permanent disability (permanent brain damage). See *Castillo*, 2018 IL App (1st) 153147, ¶ 26 (the defendant acts knowingly when she is consciously aware that her conduct is practically certain to cause the "particular result"); *c.f.*, *Boyd*, 2021 IL App (1st) 182584, ¶ 57 (verdicts are inconsistent where the jury finds an element simultaneously did and did not exist

under the " 'same set of facts' "). The jury thus could've consistently found a different mental state for either offense. Namely, the jury could have found that defendant was consciously aware shaking A.V. was practically certain to cause her great bodily harm, but not necessarily a permanent disability. See *Boyd*, 2021 IL App (1st) 182584, ¶ 57; see also *People v. Post*, 109 Ill. App. 3d 482, 492 (1982) (recognizing aggravated battery causing great bodily harm and aggravated battery causing permanent disability as distinct offenses requiring proof of a different element).

¶ 54    We therefore find no legal inconsistency in the jury's verdicts. While the two verdicts may have been based on the same act in violation of the one-act, one-crime doctrine, as we later address, it was ultimately the trial court's role to simply merge the offenses and enter judgment for one count. See *In re Samantha V.*, 234 Ill. 2d 359, 378 (2009) (where findings of guilt on multiple counts violate the one-act, one-crime doctrine, the circuit court must merge the counts). Because the jury returned legally consistent verdicts, however, we find no need to remand this case for a new trial.

¶ 55                                C. Jury Instructions

¶ 56    Defendant next argues that the trial court provided the jury with instructions and verdict forms that were improper and confusing. Specifically, she argues the instructions defining and listing the elements for the offenses, and the verdict forms, improperly treated her two charged aggravated battery charges based on great bodily harm and permanent disability as separate crimes, despite them being based on the same conduct.

¶ 57    Defendant acknowledges that she failed to preserve this issue for review, as she neither raised the issue at trial or in a posttrial motion. See *People v. Reese*, 2017 IL 120011, ¶ 60

(requirements for preserving issue for review). She nonetheless states we should consider the issue under plain error review.

¶ 58    The State asserts that plain error review is inapplicable here because defendant submitted the jury instructions she challenges and affirmatively acquiesced to the trial court's modifications on the verdict forms. Thus, the State argues that the invited error doctrine precludes us from applying plain error review. See *People v. Gibson*, 2021 IL App (1st) 190137, ¶ 16 (plain error doctrine doesn't apply to cases that involve invited error). We agree.

¶ 59    Under the invited error doctrine, a party cannot complain of an error that it brought about or participated in. *People v. Hughes*, 2015 IL 117242, ¶ 33. For the rule to apply, the defendant must affirmatively request or agree to proceed in a certain way. *People v. Spencer*, 2014 IL App (1st) 130020, ¶ 26. In this instance, defense counsel submitted the reckless conduct instructions separating out the two charges of aggravated battery. Defendant cannot directly challenge those instructions having submitted them herself through counsel. See *People v. Parker*, 223 Ill. 2d 494, 508 (2006) (a defendant cannot directly attack a jury instruction that she submitted). Moreover, defense counsel expressly told the court there was no objection to the State's aggravated battery instructions or the court's modified verdict forms, both of which also separated out the two aggravated battery charges. She also cannot directly challenge these materials, as her counsel affirmatively stated he had no objection to them. See *People v. Guy*, 2025 IL 129967, ¶ 68 (invited error doctrine barred challenge to instruction where the defendant's counsel stated there was "[n]o objection" to it); see also *People v. Parker*, 223 Ill. 2d 494, 508 (2006) (the defendant could not challenge a verdict form where his trial counsel stated there was no objection to it). Because

- 17 -

defendant invited the claimed errors in the jury instructions and verdict forms, she cannot seek plain error review of them. *Gibson*, 2021 IL App (1st) 190137, ¶ 16.

¶ 60 Defendant alternatively argues that trial counsel was ineffective for failing to object to the instructions and verdict forms. See *Guy*, 2025 IL 129967, ¶ 68 (where there was invited error, a claim of ineffective assistance of counsel was the "proper form" for overcoming procedural hurdles). To succeed on a claim of ineffective assistance of counsel, defendant must show (1) counsel's performance fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defendant. *People v. Keys*, 2025 IL 130110, ¶ 57 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Because a defendant must satisfy both prongs of the *Strickland* test, a reviewing court may resolve a claim of ineffective assistance of counsel by reaching only the prejudice prong. *Id.* ¶¶ 57-58. "Prejudice is established when a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *People v. Brown*, 2024 IL 129585, ¶ 28. Here, defendant's ineffective assistance claim fails because there is no merit in her underlying claim that the instructions and verdict forms were improper, and thus no prejudice. See *People v. Pitsonbarger*, 205 Ill. 2d 444, 465 (2002) (if the underlying claim has no merit, no prejudice resulted, and the defendant's claim of ineffective assistance of trial counsel must fail).

¶ 61 As we have stated, the State proceeded to trial on two counts of aggravated battery respectively based on great bodily harm and permanent disability. The State provided a separate set of instructions for each of those counts, defining aggravated battery of a child based on Illinois Pattern Jury Instructions, Criminal, No. 11.25 (approved Apr. 25, 2024) (hereinafter IPI Criminal No. 11.25) and listing the elements as provided in IPI Criminal No. 11.26. Defense counsel

provided two sets of instructions for the lesser-included offense of reckless conduct, each set also corresponding to one of defendant's two charges of aggravated battery. The instructions defined the offense based on IPI Criminal No. 11.37 and listed the elements based on IPI Criminal No. 11.38.

¶ 62    Additionally, the court provided the jury's two verdict forms with one form for each of the two aggravated battery charges. One form provided that the jury could find defendant (1) not guilty of aggravated battery of a child or reckless conduct based on great bodily harm; (2) guilty of aggravated battery of a child based on great bodily harm; or (3) guilty of reckless conduct based on great bodily harm. The other form provided that the jury could find defendant (1) not guilty of aggravated battery of a child or reckless conduct based on permanent disability; (2) guilty of aggravated battery of a child based on permanent disability; or (3) guilty of reckless conduct based on permanent disability. The forms were based on the committee comments of IPI Criminal No. 26.00, in which the committee suggests that, where the jury is asked to select only one verdict from several possible alternatives, the verdicts could be placed on one page with a direction to check off the verdict the jury has chosen.

¶ 63    Because the challenged jury instructions and verdict forms were all modeled after pattern instructions, we presume them proper. *Hana*, 2018 IL App (1st) 162166, ¶ 36. They were further accurate statements of the law and applicable to the case, which defendant does not appear to dispute. As such, the trial court was required to provide them to the jury in *some* form. Ill. S. Ct. R. 451(a) (eff. July 1, 2006).

¶ 64    Nonetheless, defendant argues that the jury instructions and verdict forms were improperly separated into two separate offenses, based on her two aggravated battery charges, despite being

based on the same conduct (shaking A.V.). She asserts that this led the jury to return legally inconsistent verdicts. As we have found, however, the jury did not actually return legally inconsistent verdicts. To the extent that the jury may not have understood the difference in the harms being alleged in either count, as we have also noted, the State clearly explained in closing the distinct injuries being alleged in each count. *Olaska*, 2017 IL App (2d) 150567, ¶ 127 (closing arguments can compensate for any confusing aspects of the instructions).

¶ 65    Further, there was no error in the jury being instructed on multiple charges based on the same act and making findings of guilt on them. It was ultimately the trial court's role, when receiving multiple guilty verdicts based on the same act, to enter conviction on only the most serious offense. See *People v. Akins*, 2014 IL App (1st) 093418-B, ¶ 17. As such, we see no error in presenting the jury with the instructions or verdict forms they received, nor do we see any indication in the record that the jury was confused by them. *C.f.*, *People v. Washington*, 2019 IL App (1st) 161742, ¶ 32 (instructions and verdict forms were in error and confusing where the jury wasn't instructed that one of the defendant's charges was a lesser included offense of another charge). Because defendant's underlying claim lacks merit, trial counsel couldn't have been ineffective for not objecting to the instructions and verdict forms. See *Pitsonbarger*, 205 Ill. 2d at 465 (if the underlying claim has no merit, no prejudice resulted, and the defendant's claim of ineffective assistance of trial counsel must fail).

¶ 66                                    D. Sentencing Claims

¶ 67    Defendant next raises two challenges to her sentence. First, she asserts that the trial court improperly considered her assertion of innocence as a factor in aggravation. Second, she argues that the trial court's sentence was excessive because it didn't reflect her mitigating evidence.

¶ 68     A trial court has broad discretion in sentencing a defendant, and we will not overturn its sentencing decision unless the trial court abuses its discretion. *People v. Rich*, 2025 IL App (1st) 230818, ¶ 43. We presume that the trial court considered all relevant factors at sentencing, and that presumption will not be overcome without explicit evidence from the record that the court relied on improper aggravating factors or didn't consider mitigating factors. *People v. Streater*, 2023 IL App (1st) 220640, ¶ 73. In determining whether a sentence was improper, we consider the record as a whole and will not focus only on a few words. *People v. Wade*, 2025 IL App (1st) 231683, ¶ 60. We consider defendant's two sentencing challenges separately.

¶ 69                                   1. Assertion of Innocence

¶ 70     We first turn to defendant's claim that the trial court improperly considered her assertion of innocence as an aggravating factor. Defendant acknowledges that she failed to preserve this issue for appeal, as she did not raise it before the trial court and filed no motion to reconsider sentence. See *People v. Richards*, 2021 IL App (1st) 192154, ¶ 11 (to preserve sentencing issue for appeal, a defendant must raise the issue in the trial court). Nonetheless, a trial court's reliance on an improper factor in sentencing may be reviewed for plain error, and defendant urges us to do so here. See *Wade*, 2025 IL App (1st) 231683, ¶ 56.

¶ 71     Plain error occurs where a clear or obvious error occurred and either (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Johnson*, 2024 IL 130191, ¶ 43. Defendant argues both prongs

of the plain error doctrine apply. The first question under plain error review, however, is whether a clear or obvious error occurred at all. *Id.* ¶ 44.

¶ 72    The trial court's consideration of an improper factor in aggravation generally constitutes an abuse of discretion. *Streater*, 2023 IL App (1st) 220640, ¶ 73. Defendant's stance that her assertion of innocence was an improper aggravating factor is essentially based on *People v. Byrd*, 139 Ill. App. 3d 859 (1986), and *People v. Speed*, 129 Ill. App. 3d 348 (1984). In those cases, this court held that a more severe sentence may not be imposed simply because a defendant refuses to abandon her claim of innocence. *Byrd*, 139 Ill. App. 3d at 866 (citing *Speed*, 129 Ill. Ap. 3d at 349). When determining whether a court's sentencing decision was improperly influenced by a defendant's failure to admit her guilt following a conviction, our focus is whether the sentencing court expressly or impliedly indicated the defendant would receive better sentencing treatment by abandoning her claim of innocence. *Id.*

¶ 73    A trial court is not prohibited from considering a defendant's protestation of innocence as a factor in aggravation, however, so long as its decision to treat that factor is not "automatic or arbitrary." *People v. Charleston*, 2018 IL App (1st) 161323, ¶ 29 (citing *People v. Ward*, 113 Ill. 2d 516, 529 (1986)). A sentencing court may properly consider a defendant's continued protestation of innocence in light of all the other information regarding the defendant and the case, in order to determine "what relevant meaning the defendant's attitude displays with respect to his prospect for rehabilitation and restoration to a useful place in society." *Ward*, 113 Ill. 2d at 529. As our supreme court reasoned, sentencing is a "very individualized proceeding." *Id.* 530. It would be "highly improper" to deny the trial court the right to consider any relevant information about

the defendant's character and rehabilitative potential, including the defendant's protestation of innocence. *Id.* at 530.

¶ 74 Here, in announcing its sentencing decision, the trial court expressed concern about the likelihood defendant would commit another crime, as defendant had lied about "material matters" at trial and hadn't shown "one iota of remorse." The court observed that defendant had sought to shift the blame for the offense onto her seven-year-old daughter throughout the investigation and trial. The court concluded that it was because of defendant's "own actions for which she has not ever acknowledge[d] responsibility that she faces a significant penitentiary sentence."

¶ 75 We see no error in these remarks. The court was permitted to consider defendant's insistence on innocence to the extent that it indicated her "character and prospects for rehabilitation." *People v. Abrams*, 2015 IL App (1st) 133746, ¶¶ 35-36 (citing *People v. Ward*, 113 Ill. 2d at 528). There is nothing in the record suggesting that the trial court saw defendant's assertion of innocence, in isolation, as a factor automatically or arbitrarily leading to a longer sentence, regardless of the other facts in the case. See *Charleston*, 2018 IL App (1st) 161323, ¶ 29; but see *Speed*, 129 Ill. App. 3d at 351 (the court improperly considered the defendant's assertion of innocence as an aggravating factor, where it stated the assertion "tilted the scale" toward a harsher sentence). Rather, the court's explanation of its sentencing decision as a whole showed that the court based its decision on many factors, including the seriousness of defendant's offense, the need to deter others from committing the same crime, and defendant's character and lack of remorse, which were in part supported by her inconsistent statements and blaming her daughter on the crime. *Wade*, 2025 IL App (1st) 231683, ¶ 60 (when reviewing sentence, we focus on the record as a whole and not a few words made by the court).

¶ 76 Because the court nowhere stated that defendant's assertion of innocence itself was the reason she was receiving a more severe sentence, we find no clear or obvious error occurred. Because no error occurred, there can be no plain error. See *People v. Hood*, 2016 IL 118581, ¶ 18. Likewise, defendant's alternative claim that trial counsel provided ineffective assistance by not raising an objection to the court allegedly considering her assertion of innocence also fails, as defendant cannot show prejudice when no error occurred. See *Pitsonbarger*, 205 Ill. 2d at 465 (if the underlying claim has no merit, no prejudice resulted, and the defendant's claim of ineffective assistance of trial counsel must fail).

¶ 77                                    2. Excessive Sentence

¶ 78 We next turn to defendant's argument that her 15-year sentence was excessive because it didn't reflect the mitigating evidence she presented at sentencing. We note that, as the State observes, defendant has also forfeited this issue, as she did not file a motion to reconsider sentence. See *Richards*, 2021 IL App (1st) 192154, ¶ 11 (a defendant must raise a sentencing issue in the trial court to preserve the issue for appeal). Yet, defendant does not ask us to address her excessive sentence claim under plain-error review, or that trial counsel was ineffective for not raising the issue. See *People v. Grigorov*, 2017 IL App (1st) 143274, ¶ 23 (failing to argue plain error on appeal forfeits the plain error issue); see also Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (points not argued in the appellant's opening brief are forfeited). Defendant has therefore forfeited our consideration of this issue on appeal.

¶ 79                            E. One-Act, One-Crime Doctrine

¶ 80    Defendant also argues, and the State concedes, that her reckless conduct conviction must be vacated because it was based on the same conduct as her aggravated battery conviction and therefore violates the one-act, one-crime doctrine. We agree.

¶ 81    Under the one-act, one-crime doctrine, "a criminal defendant may not be convicted of multiple offenses when those offenses are all based on precisely the same physical act." *People v. Coats*, 2018 IL 121926, ¶ 11. As the parties note, defendant also failed to preserve this issue. Nonetheless, we may review one-act, one-crime violations under plain error because they implicate the integrity of the judicial process. See *People v. Sapp*, 2022 IL App (1st) 200436, ¶ 73.

¶ 82    Here, defendant received convictions for aggravated battery and reckless conduct. We agree with the parties that both convictions were based on the same physical act, *i.e.*, defendant shaking A.V., causing her great bodily harm. Therefore, under the one-act, one-crime doctrine, defendant couldn't have received convictions for both offenses. *Coats*, 2018 IL 121926, ¶ 11.

¶ 83    Because there was a one-act, one-crime violation here, the proper remedy is to vacate the less serious conviction. *People v. Rios*, 2022 IL App (1st) 171509, ¶ 102. We agree with the parties that reckless conduct is the less serious offense as it concerns a less culpable mental state and carries a lower sentencing range.[2] See *People v. Sapp*, 2022 IL App (1st) 200436, ¶ 76 (when determining which offense is more serious, we consider the possible punishments and which

_____

[2] Reckless conduct causing great bodily harm is a Class 4 offense (720 ILCS 5/12-5(b) (West 2018)) carrying a sentencing range of 1 to 3 years (730 ILCS 5/5-4.5-45(a) (West 2018)). Aggravated battery to a child, on the other hand, carries a larger sentence, as it is a Class X felony (720 ILCS 5/12-3.05(h) (West 2018)) carrying a sentencing range of 6 to 30 years (730 ILCS 5/5-4.5-25(a) (West 2018)). Reckless conduct also carries a less culpable mental state (recklessness) than aggravated battery does (knowledge). See *People v. Lane*, 2017 IL App (1st) 151988, ¶ 15 (recklessness is a less culpable mental state than knowledge).

offense has the more culpable mental state). We therefore vacate defendant's reckless conduct conviction. See *Rios*, 2022 IL App (1st) 171509, ¶ 102.

¶ 84                                    CONCLUSION

¶ 85    For the foregoing reasons, we vacate defendant's conviction for reckless conduct and otherwise affirm the judgment of the circuit court.

¶ 86    Affirmed in part; vacated in part.