2026 IL App (1st) 241044-U

SECOND DIVISION
January 27, 2026

No. 1-24-1044

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 22C550471 |
| | ) | |
| KHEENAN ALEXANDER, | ) | Honorable |
| | ) | Margaret M. Ogarek, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE VAN TINE delivered the judgment of the court.
Justices Ellis and D.B. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held***:**  We affirm defendant's armed habitual criminal conviction over his contention that the circuit court improperly limited his re-cross examination of a witness, thereby depriving him of his sixth amendment right to confrontation. Further, we hold the armed habitual criminal statute constitutional over defendant's contention that it violates the United States Constitution and Illinois Constitution.

¶ 2    Following a bench trial, the circuit court found defendant Kheenan Alexander guilty of being an armed habitual criminal (AHC). See 720 ILCS 5/24-1.7(a) (West 2024). The court sentenced Alexander to eight years in prison. On appeal, Alexander argues the court violated his sixth amendment right to confrontation when it barred the admission of certain testimony regarding his alleged possession of a firearm. According to Alexander, that testimony would have shown it less likely that he possessed the firearm. He also argues that the AHC statute is facially unconstitutional. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                    A. Case Overview

¶ 5    On the evening of July 11, 2022, Officer Angelo Renardo noticed a vehicle idling in the parking lot of a restaurant where he was conducting a business check. Renardo approached the car and noticed the smell of burnt cannabis emanating from the vehicle. He knocked on the driver's window and the driver eventually rolled down the window, allowing Renardo to see her, as well as Alexander, who was seated in the front passenger seat. A third individual was sitting in the back. Renardo stated he observed Alexander holding paperwork and a yellow towel. Renardo did not see any weapons. He called for backup, and Officer Michael Rafferty responded.

¶ 6    Rafferty arrived on scene and walked to the front passenger side of the vehicle. Rafferty noticed Alexander making movements underneath his seat. Rafferty ordered Alexander to lower the window down fully, but Alexander refused. Rafferty then ordered Alexander to step out of the vehicle. Alexander exited the vehicle with the paperwork and yellow towel still in his hands and walked toward the back of the car. Alexander suddenly fled, and Rafferty chased and apprehended him. Renardo searched the vehicle and recovered a firearm with an extended magazine under the front passenger seat (where Alexander sat prior to exiting the car).

¶ 7 At the time of his arrest, Alexander did not have a Firearm Owners Identification (FOID) card and had three felony convictions (robbery, aggravated unlawful use of a weapon, and possession of a stolen motor vehicle) that qualified for an AHC charge. The State charged Alexander with 19 counts related to firearm possession: one AHC charge, six counts of unlawful use or possession of a weapon by a felon (UUWF), and 12 counts of aggravated unlawful use of a weapon (AUUW).

¶ 8                                    B. Bench Trial

¶ 9 The matter proceeded to a bench trial. The central question at trial was whether Alexander possessed the subject firearm. We relate the trial testimony germane to the issue of possession.

¶ 10                                    1. Officer Renardo

¶ 11 The State first called Renardo, who testified that, at about 9:30 p.m. on July 11, 2022, he observed a vehicle idling in the parking lot of a restaurant. He approached the vehicle in his squad car and smelled "an odor of burnt cannabis in the area of that vehicle." He observed two individuals in the front two seats, and they appeared to be smoking. Renardo positioned his squad car behind the vehicle and turned on his spotlight to illuminate the idling car. The car then pulled forward approximately 40 feet to the rear of the restaurant. Renardo pulled up to the vehicle and exited, approaching the idling car on foot. Renardo proceeded to the driver's side and knocked on the window. Eventually, the driver rolled down her window slightly. There were three individuals in the vehicle; the third was in the back alone. Renardo checked their identification cards, returned them, and radioed for backup.

¶ 12 Rafferty responded to the call and arrived on scene. Alexander fled from the scene on foot after being ordered to exit the vehicle. Rafferty pursued Alexander while Renardo remained on scene, soon thereafter searching the car to recover a cannister of cannabis and a black handgun

with an extended magazine under the front passenger's side seat. Renardo issued the driver a local ordinance citation for the cannabis offense. He secured the recovered handgun in his squad car. Renardo never saw Alexander in possession of a firearm or any shiny object.

¶ 13    The State produced body-worn camera (BWC) footage from Renardo. Renardo's BWC footage begins at 9:26 p.m. It depicts Renardo exiting his squad car and approaching an idling car parked adjacent to a restaurant. Renardo approaches the car on foot, walking first to the passenger's side and eventually making his way to the driver's side. At that point, an individual in the back seat lowers the back left window slightly, as Renardo announces his presence and requests everyone's identification cards. He orders the windows lowered, but no one seems to comply for a couple minutes. Eventually, the passenger in the back and the driver hand their driver's licenses to Renardo, who inspects them quickly and then returns them.

¶ 14    At approximately 9:30 p.m., the individual seated in the front passenger seat (Alexander) can be seen holding papers first in his left hand and then placing them into his right hand. A bright yellow towel sits on his left thigh. About a minute later, upon Rafferty's orders, Alexander exits the car and walks toward the back of it with his hands in the air, holding paperwork and a yellow towel in his hands. He suddenly flees, and Rafferty and another officer pursue Alexander on foot. Renardo remains near the idling car, in which the driver and back seat passenger are still seated. At 9:33 p.m., Renardo orders the two occupants to exit the car. Renardo searches the car and, at 9:38 p.m., recovers a handgun with an extended magazine underneath the front passenger's seat (where Alexander was seated before he exited and fled). He inventories both the firearm and magazine, placing them in the trunk of his squad car at 9:41 p.m. He issues the driver a citation.

¶ 15                                    2. Officer Rafferty

¶ 16    The State then called Rafferty, who testified he arrived at the scene to assist Renardo regarding a "suspicious vehicle." He was alone, in uniform, and drove his squad car to the scene. Upon arriving, he observed Renardo standing next to the vehicle. The windows were rolled down an inch or two. Renardo was on the driver's side of the idling vehicle. Rafferty "detected a strong odor of fresh and burnt cannabis along with [Alexander] making numerous like forward movements underneath the front passenger seat." He testified he "could see the passenger trying to reach under the passenger seat." Alexander "was reaching under his seat where he was leaning down like almost between his feet." Rafferty ordered Alexander to lower his window "numerous times", but he did not comply. Rafferty requested Alexander to exit the vehicle, and Alexander exited and fled on foot. Rafferty chased him, also on foot, and apprehended him.

¶ 17    Rafferty also initially testified that Alexander had some papers and envelopes in his hands, but he did not observe a towel. Rafferty initially did not know where the papers were when Alexander made the movement toward the floor. Rafferty then testified that Alexander had a yellow towel in his left hand and "numerous documents and envelopes" in his right hand, which were the same items Alexander had in his hands and lap while seated.

¶ 18    On re-cross examination, defense counsel asked Rafferty at what point he saw the documents in Alexander's left hand and the yellow towel in his right hand. Before Rafferty could answer, the State objected on grounds of the question being beyond the scope, and the court sustained the objection. This limitation is the central issue in this appeal. Rafferty did not relate to the other officers on scene that he observed Alexander making sudden or furtive movements.

¶ 19    The State also introduced Rafferty's BWC footage, which depicts him exiting his squad car at the scene at approximately 9:29 p.m. and walking to the idling car. As he arrives at the car, two officers are already there. He knocks on the passenger's side window (where Alexander is

seated), and Alexander appears to lower the window slightly. He refuses to lower it completely. Rafferty orders him to exit the vehicle, and he does. Alexander walks toward the back of the car and flees. Rafferty chases Alexander on foot initially. At approximately 9:35 p.m., he enters his squad car and begins driving rapidly. After a few turns, Rafferty arrives outside of a Dave and Buster's restaurant. He walks inside to find officers who have already apprehended Alexander and are leading him outside.

¶ 20    The State rested its case, and Alexander moved the court for a directed finding, which the court granted in part. It granted Alexander's motion as to three counts of UUWF, finding the State produced no evidence that Alexander was on mandatory supervisory release or parole at the time of the offense. The court denied the motion on all other counts. Alexander chose not to testify, and the defense rested its case.

¶ 21                                    3. The Court's Judgment

¶ 22    The circuit court found Alexander guilty on all charges except the three UUWF counts. The court noted that the matter boiled down to "a case of constructive possession." It found both officers' testimony credible and did not believe they overstated anything in their testimony. The court found that Rafferty's testimony "essentially corroborate[d] what Officer Renardo testified to," but "with the added component of seeing furtive movements from [Alexander] inside the vehicle." The court stated, "I think that is a matter of different perspectives. When people are at different locations, they see things differently and at some point both videos actually, you can see [Alexander] moving around inside that vehicle in that front passenger location." The court "found the yellow towel to be quite interesting especially in light of the fact that there were not fingerprints recovered from the weapon or DNA according to the testimony elicited on cross-examination."

¶ 23    Alexander requested a new trial, and the court denied his motion. At a separate hearing, the court sentenced Alexander to eight years' imprisonment.

¶ 24    Alexander appeals.

¶ 25                                    II. ANALYSIS

¶ 26    On appeal, Alexander argues that (1) the court deprived him of his sixth amendment right to confrontation, and (2) the AHC statute is facially unconstitutional.

¶ 27                              A. The Sixth Amendment

¶ 28    A "primary interest" of the sixth amendment's confrontation clause is the "right of cross-examination." *Douglas v. State of Alabama*, 380 U.S. 415, 418 (1965). Alexander argues that the circuit court violated his right to confront Rafferty when it sustained an objection on re-cross examination. Alexander contends that if he would have been allowed to "elicit testimony that because [his] hands were full, he could not have hidden a gun, or that any potential movements could be explained by [him] having picked up the objects", it would have been less likely that the State could prove possession. Possession is a key element for an AHC conviction. See 720 ILCS 5/24-1.7(a) (West 2024). In short, Alexander challenges the possession element, arguing that had Rafferty's additional testimony been allowed, it would have shown that it was less likely that he possessed the subject firearm.

¶ 29    Possession can be actual or constructive. *People v. McLaurin*, 331 Ill. App. 3d 498, 502 (2002). To establish constructive possession, "the State must prove beyond a reasonable doubt that a defendant (1) knew a firearm was present; and (2) exercised immediate and exclusive control over the area where the firearm was found." *People v. Wise*, 2021 IL 125392, ¶ 28. Knowledge is the mental element of the offense and "it is often proven by circumstantial evidence rather than by direct proof." *People v. Wade*, 2025 IL App (1st) 231683, ¶ 25.

¶ 30    Alexander essentially concedes he did not raise this issue with sufficient specificity in his posttrial motion to preserve it for appeal; thus, he requests plain error review.[1] With that context in mind, we recount the relevant portions of Rafferty's trial testimony, beginning with the following exchange between the State and Rafferty on re-direct examination:

"[STATE]: Officer Rafferty, when you were speaking initially with the Defendant at the – when he was still seated in the car, you requested his driver's license, correct? Mr. Alexander, isn't that correct?

[RAFFERTY]: Yes.

[STATE]: And he did provide that, correct?

[RAFFERTY]: Yes.

[STATE]: And it was his driver's license, correct?

[RAFFERTY]: Yeah.

[STATE]: And you indicated on cross that the windows were tinted of the vehicle, but you also indicated that you saw the Defendant reach under the seat. Can you explain how you were able to see that.

[Rafferty] How? Through the front windshield and through the two-inch gap of the window itself where I shined my flashlight through.

[STATE]: And that part of the window was open?

[RAFFERTY]: The two-inch gap; yes, it was.

[STATE]: And was the windshield tinted?

[RAFFERTY]: I don't remember if the windshield was tinted.

---

[1]To preserve an issue for review, the defendant must both object at trial and raise the issue in posttrial motion. *People v. Reese*, 2017 IL 120011, ¶ 60.

[STATE]: Was it – in comparison to the passenger's – front passenger's side window, was it more or less tinted if you recall?

[RAFFERTY]: It was less tinted than the front passenger windows."

On re-cross examination, the following exchange occurred between defense counsel and Rafferty:

"[COUNSEL]: Your body camera doesn't show you looking through the front window at Mr. Alexander, isn't that correct?

[RAFFERTY]: It does.

[COUNSEL]: Well, aren't you standing directly on the side of the passenger side?

[RAFFERTY]: At one point you see me shine my flashlight through the front windshield.

[COUNSEL]: But you're not standing in front of the vehicle, correct?

[ASA]: Objection. Beyond the scope.

[COURT]: No, it's not beyond the scope. You can answer.

[COUNSEL]: You're not standing in front of the vehicle, is that correct?

[RAFFERTY]: You can still see.

[COUNSEL]: So, from – your testimony is that from the passenger side window you can see through the front windshield.

[Rafferty]: When you're by the mirror if you shine your light and you look like this; yes.

[COUNSEL]: Okay. So, when you saw that – again I'm going to ask. At what point was it that you saw the items in my client's hands?

[ASA]: Objection. Beyond the scope.

[COURT] Sustained.

[COUNSEL]: Nothing further, Judge."

¶ 31                                    1. Plain Error Review

¶ 32    As noted above, Alexander concedes that he did not preserve the issue of the circuit court's allegedly improper limitation of testimony. See *Reese*, 2017 IL 120011, ¶ 60. However, the plain error doctrine allows a reviewing court to consider unpreserved claims of error where (1) "a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error" or (2) "a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Belknap*, 2014 IL 117094, ¶ 48; see Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). The first step of plain error review is determining whether an error occurred at all. *People v. West*, 2017 IL App (1st) 143632, ¶ 11. The defendant bears the burden of persuasion in plain error analysis. *People v. Sebby*, 2017 IL 119445, ¶ 51. So, the first question here is whether the court deprived Alexander of his right to confront Rafferty.

¶ 33    The right to confront witnesses is enshrined in both the federal and state constitutions. See U.S. Const., amends. VI, XIV; Ill. Const. 1979, art. I, § 8. The constitutional guarantee to confrontation and the common law right to it are separate. *People v. Averhart,* 311 Ill. App. 3d 492, 497 (1999). The constitutional issue, which we review *de novo*, asks whether Alexander had an opportunity to cross-examine Rafferty. See *People v. Williams*, 238 Ill. 2d 125, 141 (2010). If we answer that in the affirmative, then we consider whether the court abused its discretion in restricting the scope of cross-examination. See *People v. Arze*, 2016 IL App (1st) 131959, ¶ 113.

¶ 34                                    a. Constitutional Error

¶ 35    "The right to confront and cross-examine is not absolute." *People v. Bean*, 137 Ill. 2d 65, 93 (1990). "The Confrontation Clause guarantees an *opportunity* for effective cross-examination,

not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (Emphasis in original.) *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). If the record as a whole indicates the defense has the opportunity to examine relevant areas of impeachment of a witness, "no constitutional question arises merely because defendant has been prohibited on cross-examination from pursuing other areas of inquiry." *People v. Green*, 339 Ill. App. 3d 443, 456 (2003) (quoting *People v. Averhart,* 311 Ill. App. 3d 492, 497 (1999)). A "trial judge retains wide latitude to impose reasonable limits" where a party seeks to continue interrogation that is repetitive or largely irrelevant. *People v. Klepper*, 234 Ill. 2d 337, 355 (2009).

¶ 36    "To determine the constitutional sufficiency of cross-examination, a court looks not to what a defendant has been prohibited from doing, but to what he has been allowed to do." *Averhart*, 311 Ill. App. 3d at 497. "On review, we are not required to isolate the particular limitation on cross-examination to determine whether reversible error has occurred." *Klepper*, 234 Ill. 2d at 356. Rather, we consider whether defendant's inability to ask a particular question created a "substantial danger of prejudice" by depriving him of the ability to test the truth of a witness's testimony. *People v. Harris*, 123 Ill. 2d 113, 145 (1988).

¶ 37    Upon review of the record and trial transcript, we find that Alexander had ample opportunity to confront Rafferty, during both cross and re-cross examination. During cross-examination, defense counsel questioned Rafferty, who testified that when he arrived on scene, he immediately proceeded to the passenger's side of the car. The window was approximately two inches down and Rafferty could see that Alexander had papers and envelopes in his right hand. He did not see the yellow towel. Rafferty testified that he observed Alexander reach under the passenger seat he was seated in. Rafferty stated he did not remember whether Alexander had the objects in his hand when he observed Alexander reaching down. Rafferty's memory was then

refreshed, and he agreed that the objects were in Alexander's hands when he reached down under the passenger seat in which he was seated.

¶ 38    So, defense counsel elicited testimony that Rafferty, immediately upon arriving on scene, proceeded to the passenger's side window and shortly thereafter observed Alexander with the towel and papers in his hands, reaching down under his seat. Rafferty testified he did not know what Alexander did with the items. On re-cross examination, defense counsel again asked at what point Rafferty observed the items in Alexander's hands. The State objected as to the scope and the court sustained. We cannot say, based on the foregoing, that Alexander did not have an opportunity to confront Rafferty. The circuit court gave Alexander ample opportunity for cross-examination. We decline to speculate on what Rafferty *could* have said that would materially impact Alexander's theory of the case. We find that whatever testimony defense counsel sought to elicit was sufficiently remote and speculative, such that the circuit court's limitations on Alexander's cross-examination of Rafferty failed to create a "substantial danger of prejudice" to him. See *People v. Green*, 339 Ill. App. 3d 443, 457 (2003); *Harris*, 123 Ill. 2d at 145.

¶ 39    Finally, we note that defense counsel asked the question at issue at least once before (during cross-examination). In fact, defense counsel acknowledged that fact during re-cross examination: "*again* I'm going to ask." The defense was aware that Rafferty, on cross-examination, had explained that he observed Alexander holding the items in his hands as he reached under the seat. Alexander cannot now argue he was denied the opportunity to cross-examine. Moreover, circuit courts have wide latitude to bar "repetitive" testimony. *Klepper*, 234 Ill. 2d at 355. The fact that Alexander may be unsatisfied with the content of Rafferty's answers does not in and of itself amount to a confrontation clause violation. See *People v. Tracewski*, 399 Ill. App. 3d 1160, 1166

(2010) ("There are no confrontation clause problems merely because the witness's memory problems preclude him from being cross-examined to the extent the parties would have liked.").

¶ 40    Based on the foregoing, we find that the circuit court did not deprive Alexander of his right to confrontation.

¶ 41                                    b. Abuse of Discretion

¶ 42    We review the circuit court's limitation on the testimony for abuse of discretion. *Arze*, 2016 IL App (1st) 131959, ¶ 113. The circuit court's rulings on the scope of cross-examination and re-cross-examination are within its sound discretion. *People v. Johnson*, 2013 IL App (1st) 111317, ¶ 37. To amount to an abuse of discretion, the court's decision must be fanciful, arbitrary or unreasonable to the degree that no reasonable person would agree with it. *People v. Johnson*, 2020 IL App (1st) 162332, ¶ 40. Re-cross examination is limited in scope to responding to the testimony elicited during re-direct examination. *People v. Franklin*, 135 Ill. 2d 78, 91 (1990).

¶ 43    On re-cross examination, the court barred a question that had already been asked and answered during cross examination. Defense counsel would likely not have discovered anything new by asking Rafferty the exact same question over, as it did during re-cross examination. The circuit court properly sustained the objection and did not abuse its discretion. See *Klepper*, 234 Ill. 2d at 355 (it is well within the court's sound discretion to limit repetitive questioning).

¶ 44    Having found no error, we need not conduct the remainder of the plain error analysis. See *People v. Hood*, 2016 IL 118581, ¶ 18 ("without error, there can be no plain error" (internal quotation marks omitted)).

¶ 45                                    2. Assistance of Counsel

¶ 46    Alexander also contends that his trial counsel provided ineffective assistance for failing to properly preserve the issue at trial or in his posttrial motion.

¶ 47    To establish ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), a defendant must show (1) that counsel's performance was objectively unreasonable and (2) prejudice, *i.e.*, that there is a reasonable probability the result of the proceeding would have been different but for counsel's deficient performance. *People v. Patterson*, 2014 IL 115102, ¶ 81. "[I]f an ineffective-assistance claim can be disposed of because the defendant suffered no prejudice, we need not determine whether counsel's performance was deficient." *People v. Graham*, 206 Ill. 2d 465, 476 (2003).

¶ 48    Our supreme court has held that "on a claim of ineffective assistance for failing to properly preserve issues for review, defendant's rights are protected by Supreme Court Rule 615(a), which allows a court to review unpreserved claims of plain error that could reasonably have affected the verdict." *People v. Coleman*, 158 Ill. 2d 319, 349-50 (1994). In so holding, the *Coleman* court declined to review the defendant's ineffective assistance of counsel claim. *Id.* Under these supreme court principles, we hold that Alexander's rights were adequately protected by Rule 615(a) and the plain error doctrine, under which we found no error. That is, regardless of whether Alexander's counsel was ineffective in preserving the issue of the barred testimony, Alexander was not prejudiced because the court did not err in its limitation. Put differently, even if counsel had properly objected and filed a posttrial motion with specificity, it would not have altered the outcome, as the circuit court acted within its discretion. See *Graham*, 206 Ill. 2d at 476. Accordingly, there is no need to engage in further analysis of the same issue cloaked as a separate cause of action.

¶ 49                    B. Armed Habitual Criminal Statute

¶ 50    Alexander argues that, because possession of a firearm is a "core protected right" of Americans, gun possession is presumptively lawful. Additionally, he contends, "because the State

cannot present compelling historical analogues to permanent disarmament based on prior felonies, the AHC statute is facially unconstitutional." Alexander contends that the AHC statute violates both the federal and state constitution. We begin by setting forth the relevant statutory and constitutional text.

¶ 51    The circuit court found Alexander guilty of violating section 1.7(a) of the AHC statute. 720 ILCS 5/24-1.7(a) (West 2024). That section provides that a person is an armed habitual criminal if he possesses a firearm after having been convicted two or more times of certain enumerated offenses. *Id.*

¶ 52    The second amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II.

¶ 53    Finally, Article I, section 22, of the Illinois Constitution provides: "Subject only to the police power, the right of the individual citizen to keep and bear arms shall not be infringed." Ill. Const. 1970, art. I, § 22.

¶ 54    As this court has long held, we presume statutes are constitutional, and "we have the duty to construe statutes so as to uphold their constitutionality if there is any reasonable way to do so." *People v. Jones*, 223 Ill. 2d 569, 595-96 (2006) (citing *Arangold Corp. v. Zehnder*, 187 Ill. 2d 341, 351 (1999), and *People v. Inghram*, 118 Ill. 2d 140, 146 (1987)). A facial challenge requires a showing that the statute in question is unconstitutional under any set of facts. *People v. Thompson*, 2015 IL 118151, ¶ 36. The burden on the challenger is "particularly heavy when *** a facial constitutional challenge is presented." *Bartlow v. Costigan*, 2014 IL 115152, ¶ 18. A constitutional challenge to a statute presents a question of law, which we review *de novo. People v. Madrigal*, 241 Ill. 2d 463, 466 (2011).

¶ 55    Our supreme court has not yet considered the AHC statute's constitutionality, but our appellate courts have considered Alexander's argument on many occasions and overwhelmingly rejected constitutional challenges to the AHC statute. As to the United States Constitution, see, *e.g.*, *People v. Redmond*, 2025 IL App (1st) 231795, ¶ 42 (rejecting both as-applied and facial challenges to the AHC statute); *People v. Lopez*, 2025 IL App (1st) 232120, ¶¶ 22, 27 (same); *People v. Gray*, 2025 IL App (1st) 191086-B, ¶¶ 20, 23 (same); *People v. Kelley*, 2024 IL App (1st) 230569, ¶¶ 16-22 (same); *People v. Travis*, 2024 IL App (3d) 230113, ¶¶ 33, 37 (same).

¶ 56    As to the Illinois Constitution, see, *e.g.*, *People v. Hudson*, 2025 IL App (5th) 231140-U, ¶ 26 (the court found that "the AHC is constitutional under the Illinois Constitution, facially and as applied to the defendant."); *People v. Wade*, 2025 IL App (1st) 231683, ¶ 51 ("We nevertheless observe that laws prohibiting felons from possessing firearms have been repeatedly held to be consistent with the Illinois Constitution, and we agree with those courts that have found such statutes constitutional."); *Kelley*, 2024 IL App (1st) 230569, ¶ 30 ("nothing in article I, section 22, of the Illinois Constitution suggests that the right to bear arms is unlimited and bars the State from prohibiting felons from bearing arms."); *Travis*, 2024 IL App (3d) 230113, ¶ 42 (the "AHC and UUWF statutes are a proper exercise of the state's police power, which allows the state to exert, through legislation, control over the dangers posed by firearms and the people who might use them to do harm.").

¶ 57    We see no reason to depart from these well-reasoned decisions, and we hold the AHC statute facially constitutional under both the United States Constitution and Illinois Constitution.

¶ 58                                  III. CONCLUSION

¶ 59    For these reasons, we affirm the judgment of the circuit court of Cook County.

¶ 60    Affirmed.